**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| STACY HOLK, | : | CIVIL ACTION NO. 07-3018 (MLC) |
| | : | |
| Plaintiff, | : | **MEMORANDUM OPINION** |
| | : | |
| v. | : | |
| | : | |
| SNAPPLE BEVERAGE CORPORATION, | : | |
| | : | |
| Defendant. | : | |

**COOPER, District Judge**

Plaintiff, Stacy Holk ("Plaintiff"), commenced this action
on behalf of herself and all others similarly situated against
Snapple Beverage Corporation ("Snapple").  (Dkt. entry  no. 25,
Amend. Compl.)  Plaintiff alleges, <u>inter</u> <u>alia</u>, that Snapple (1)
violated the New Jersey Consumer Fraud Act, N.J.S.A. § 56:8-1 <u>et</u>
<u>seq.</u>, (2) was unjustly enriched by its wrongful and deceptive
conduct, and thus, should be required to disgorge its "illegally
gotten gains", (3) breached certain of its express warranties,
and (4) breached the implied warranty of merchantability.  (<u>Id.</u>)
Snapple moves to dismiss the amended complaint with prejudice,
or, in the alternative, without prejudice pursuant to the primary
jurisdiction doctrine.  (Dkt. entry no. 26.)  Plaintiff opposes
the motion.  (Dkt. entry no. 29.)  For the reasons stated herein,
the Court will grant the motion.

**BACKGROUND**

I.   **Overview of Plaintiff's Factual Allegations**

The Court, for the purpose of addressing this motion only, will accept as true the following factual allegations contained in the amended complaint.  See Cal. Pub. Employees' Ret. Sys. v. Chubb Corp., 394 F.3d 126, 134 (3d Cir. 2004).

Snapple manufactures and sells beverages throughout the United States.  (Dkt. entry no. 25, Amend. Compl., at ¶ 19.)  In its advertising and marketing materials, Snapple describes its iced tea and juice drinks as "All Natural".  (Id. at ¶ 22.)  Plaintiff asserts, however, that Snapple's iced tea and juice drinks are not "All Natural" because they contain High Fructose Corn Syrup ("HFCS"), a highly processed sugar substitute.  (Id. at ¶¶ 23-24.)  Specifically, HFCS is produced when:

> [C]ornstarch is first treated with a purified enzyme, alpha-amylase, to produce shorter chains of sugars called polysaccharides. . . .  The polysaccharides (short chains of sugar) are then broken down even further by adding a second enzyme called glucoamylase. . . .  The addition of glucoamylase to the polysaccharides yields the simple sugar glucose.  In lieu of using alpha-amylase or glucoamylase, acids may be used in the HFCS production process.  A third enzyme, gluco-isomerase, then converts glucose to a mixture of about 42 percent fructose and 50 to 52 percent glucose with some other sugars (or short polymers of glucose) mixed in.  While alpha[-]amylase and glucoamylase are added directly to the slurry, pricey glucose-isomerase is packed into columns and the sugar mixture is then passed over it.  The sweet liquid with 42 percent fructose is used as HFCS 42 in some applications.  To obtain a higher percentage of fructose in HFCS, two or more steps are necessary.

(Id. at ¶¶ 27-31.)  Thus, Plaintiff argues that the molecules in HFCS do not originate from natural sources, but instead are created through "enzymatically catalyzed chemical reactions in factories".  (Id. at ¶ 33.)

Plaintiff purchased two bottles of Snapple's Acai Blackberry Fruit Juice Drink on May 4, 2007.  (Id. at ¶ 37.)  She paid $1.09 per bottle.  (Id.)  Plaintiff asserts that she purchased other Snapple beverages "[a]t various other times over the course of the preceding six (6) years", and Snapple advertised and promoted its products as being "All Natural" at the time of each purchase.  (Id. at ¶¶ 38-40.)  Plaintiff contends that, inter alia, she suffered losses as a result of Snapple's misleading, inaccurate, and deceptive advertising "in that she paid a premium for Snapple's beverages but received something less than and different from what was promised and bargained for."  (Id. at ¶ 44.)

## II.  The Federal Food, Drug, and Cosmetic Act

The Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 et seq., ("FFDCA") gives the Federal Food and Drug Administration ("FDA") broad authority to regulate food and beverage labeling. There is no private right of action under the FFDCA.  12 U.S.C. § 337(a).  Instead all proceedings to enforce or "restrain violations of" the FFDCA must be commenced by the United States. Id.  The FDA can enforce the FFDCA by, inter alia, recalling

products that violate its provisions or seeking a judicial order
enjoining such products. See 21 U.S.C. § 332; 21 C.F.R. § 7.40.

The FDA has promulgated comprehensive regulations pursuant
to its authority under the FFDCA. 21 C.F.R. § 1.1 et seq.; see
21 U.S.C. § 341 ("Whenever in the judgment of the Secretary such
action will promote honesty and fair dealing in the interest of
consumers, he shall promulgate regulations fixing and
establishing for any food . . . a reasonable definition and
standard of identity, [or] a reasonable standard of quality[.]").
With respect to beverages containing fruit or vegetable juice,
these regulations require that:

> [for] a carbonated or noncarbonated beverage that
> contains less than 100 percent and more than 0 percent
> fruit or vegetable juice, the common or usual name
> shall be a descriptive name . . . and, if the common or
> usual name uses the word "juice," shall include a
> qualifying term such as "beverage," "cocktail," or
> "drink" appropriate to advise the consumer that the
> product is less than 100 percent juice (e.g., "diluted
> grape juice beverage" or "grape juice drink").

21 C.F.R. § 102.33(a). Further, if the product is a diluted
multiple juice drink or a blend of single-strength juices, then
the juices must be listed on the product label in descending
order of prominence by volume, with certain exceptions. 21
C.F.R. § 102.33(b).

The FDA regulations contain detailed rules pertaining to (1)
the common or usual name for diluted multiple-juice beverages or
a product containing a blend of single-strength juices, (2) label

depictions by "vignette or other pictorial representation" on products that have been either modified such that the original juice is not recognizable when processing is complete, or diminished of nutrients, and (3) naming juices made completely or partially from concentrate.  21 C.F.R. § 102.33(c)-(g).  They also require all beverages purporting to contain fruit or vegetable juice, through their name, label, or a pictorial representation, to prominently declare, with certain exceptions, (1) the percentage of fruit or vegetable juice (e.g., "Contains __ % __ juice"), (2) if the beverage contains less than 1% of a particular juice, (3) if the beverage contains 100% juice with other added ingredients, preservatives, or sweeteners, and (4) if the beverage contains no or 0% juice when the labeling, color, or flavor of the beverage suggests that a fruit or vegetable might be present.  21 C.F.R. § 101.30(a)-(g).  Thus, the FDA has promulgated extensive regulations governing various aspects of labeling beverages containing fruit juice.

The FDA defines "artificial flavor" as "any substance, the function of which is to impart flavor, which is not derived from a spice, fruit or fruit juice, vegetable or vegetable juice, edible yeast, herb, bark, bud, root, leaf or similar plant material, meat, fish, poultry, eggs, dairy products, or fermentation products thereof."  21 C.F.R. § 101.22(a)(1).  In contrast, the FDA defines "natural flavor" as "the essential oil,

oleoresin, essence or extractive, protein hydolysate, distillate, any product of roasting, heating or enzymolysis, which contains the flavoring constituents derived from" the above list.  21 C.F.R. § 101.22(a)(3).  The FDA's current policy regarding the term "natural" is to (1) not restrict its use, except for added color, synthetic substances, and flavors, and (2) construe it as meaning that "nothing artificial or synthetic (including all color additives regardless of source) has been included in, or has been added to, a food that would not normally be expected to be in the food."  58 Fed. Reg. 2302, 2407 (Jan. 6, 1993).  However, the FDA has also noted that there are many facets to the issue of how to properly define the term "natural", and thus, it has not "undertak[en] rulemaking to establish a definition for 'natural'".  Id.  (See Def. Br., Ex. C, 12-12-05 FDA Letter to Zamora, at 1-2 ("Because of resource limitations and other agency priorities, FDA is not undertaking rulemaking to establish a definition for 'natural' at this time.").)

**DISCUSSION**

**I.   Legal Standards**

**A.   Rule 12(b)(6)**

The Court may dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed.R.Civ.P. 12(b)(6).  On a motion to dismiss, the Court generally must accept as true all of the factual allegations in the complaint, and must draw

6

all reasonable inferences in favor of the plaintiff.  <u>Chubb
Corp.</u>, 394 F.3d at 134; <u>Doe v. Delie</u>, 257 F.3d 309, 313 (3d Cir.
2001).  However, the Court need not credit bald assertions or
legal conclusions alleged in the complaint.  <u>In re Burlington
Coat Factory Sec. Litig.</u>, 114 F.3d 1410, 1429-30 (3d Cir. 1997);
<u>Morse v. Lower Merion Sch. Dist.</u>, 132 F.3d 902, 906 (3d Cir.
1997).  The plaintiff's "[f]actual allegations must be enough to
raise a right to relief above the speculative level, on the
assumption that all the allegations in the complaint are true
(even if doubtful in fact)".  <u>Bell Atl. Corp. v. Twombly</u>, 127
S.Ct. 1955, 1965 (2007).

The Court, when considering a motion to dismiss, may
generally not "consider matters extraneous to the pleadings."  <u>In
re Burlington Coat Factory Sec. Litig.</u>, 114 F.3d at 1426.
However, if the Court exercises discretion and permits a party to
present matters outside the pleadings, the Court must (1) convert
the motion to dismiss into one for summary judgment, and (2)
allow the parties a reasonable opportunity to present all
material pertinent to such a motion under Rule 56.  <u>See</u>
Fed.R.Civ.P. 12(b).  An exception to this general rule is that
the Court may consider (1) exhibits attached to the complaint,
(2) matters of public record, and (3) all documents that are
integral to or explicitly relied upon in the complaint without
converting the motion to dismiss into one for summary judgment.
<u>Angstadt v. Midd-West Sch. Dis.</u>, 377 F.3d 338, 342 (3d Cir. 2004).

**B.    Preemption**

Congressional intent or purpose is the "ultimate touch-
stone" in every preemption analysis.  Medtronic, Inc. v. Lohr,
518 U.S. 470, 485 (1996) (explaining that in determining the
scope of a preemption provision in a statute, the Court must rely
on "a fair understanding of congressional purpose").  The Court
must discern congressional intent from the language of the
allegedly preemptive provision and the statutory framework
surrounding it.  Id. at 486.  However, the structure and purpose
of the statute as a whole may also be instructive.  Id.

State statutory and common laws are preempted under the
Supremacy Clause of the United States Constitution in three
circumstances.  English v. Gen. Elec. Co., 496 U.S. 72, 78
(1990).  Express preemption arises when Congress expressly
articulates the extent to which a federal statute preempts state
law.  Lindsay v. Caterpillar, Inc., 480 F.3d 202, 205 (3d Cir.
2007); see English, 496 U.S. at 79 ("Pre-emption fundamentally is
a question of congressional intent, and when Congress has made
its intent known through explicit statutory language, the courts'
task is an easy one." (internal citation omitted)).  "[I]n the
absence of explicit statutory language, state law is subject to
field preemption if it regulates conduct in a field that Congress
intended the federal government to occupy exclusively."  English,
496 U.S. at 79; Lindsay, 480 F.3d at 205; see C.E.R. 1988, Inc.

v. Aetna Cas. & Sur. Co., 386 F.3d 263, 269 (3d Cir. 2004)
(explaining that field preemption exists when "federal law so
thoroughly occupies a legislative field as to make reasonable the
inference that Congress left no room for the States to supplement
it"). However, if the "field" is one that was traditionally
governed by state law, congressional intent to preempt state law
must be "clear and manifest". English, 496 U.S. at 79.

The third type of preemption arises when either it is
impossible to comply with both a state and federal law, or a
state law is an obstacle to the accomplishment of a congressional
purpose or objective. Id.; Lindsay, 480 F.3d at 205-06; C.E.R.
1988, Inc., 386 F.3d at 269; see PA Employees Benefit Trust Fund
v. Zeneca Inc., 499 F.3d 239, 247 (3d Cir. 2007). In such
instances, the state law is preempted to the extent it conflicts
with a federal law. English, 496 U.S. at 79; Lindsay, 480 F.3d
at 205-06; C.E.R. 1988, Inc., 386 F.3d at 269; see Zeneca Inc.,
499 F.3d at 247. This third type, implied conflict preemption,
renders a state law invalid when it conflicts with federal law.
Zeneca Inc., 499 F.3d at 247. Thus, the Court must consider the
question, "[d]id Congress, in enacting the Federal Statute,
intend to exercise its constitutionally delegated authority to
set aside the laws of a State? If so, the Supremacy Clause
requires courts to follow federal, not state, law." Id. Both

statutes and federal agency regulations may be a source of preemptive law.  Id. at 249.[1]

### C.  Primary Jurisdiction Doctrine

The primary jurisdiction doctrine promotes the proper relationship between courts and administrative agencies.  United States v. W. Pac. R.R. Co., 352 U.S. 59, 63 (1965).  It is not intended to limit judicial authority, but instead is intended to "serve as a means of coordinating administrative and judicial machinery and to promote uniformity and take advantage of the agencies' special expertise."  CSX Transp. Co. v. Novolog Bucks County, 502 F.3d 247, 253 (3d Cir. 2007) (citation omitted). Thus, the doctrine "applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body . . . ."  W. Pac. R.R. Co., 352 U.S. at 64; see P.R. Mar. Shipping Auth. v. Valley Freight Sys., 856 F.2d 546, 549 (3d Cir. 1988) (explaining that the rationale behind the primary jurisdiction doctrine is that the question falls so squarely within the agency's domain that it

---

[1] The three categories of preemption are not rigidly distinct.  English, 496 U.S. at 79 n.5.  "Indeed, field pre-emption may be understood as a species of conflict pre-emption: a state law that falls within a pre-empted field conflicts with Congress' intent (either express or plainly implied) to exclude state regulation."  Id.

should be called upon to decide it).  In such instances, the
Court may refer specific questions to the administrative body
responsible for deciding such questions.

## II.  Legal Standards Applied Here

The FFDCA expressly preempts certain types of state
regulations pertaining to nutrition labeling on food.  See 21
U.S.C. § 343-1.  For example, the FFDCA provides that:

> no State or political subdivision of a State may
> directly or indirectly establish under any authority or
> continue in effect as to any food in interstate
> commerce --
>
>     (2) any requirement for the labeling of food of
> the type required by section 403(c), 403(e), 403(i)(2),
> 403(w), or 403(x) [21 U.S.C. § 343(c), (e), (i)(2),
> (w), or (x)] that is not identical to the requirement
> of such section[.]
>
>     (3) any requirement for the labeling of food of
> the type required by section 403(b), 403(d), 403(f),
> 403(h), 403(i)(1), or 403(k) [21 U.S.C. § 343(b), (d),
> (f), (h) (i)(1), or (k)] that is not identical to the
> requirement of such section[.]

21 U.S.C. § 343-1(a)(2)-(3).  The subsections of 21 U.S.C. § 343
that are referenced in these paragraphs state that a food is
deemed misbranded if it is (1) offered for sale under the name of
another food, (2) an imitation of another food, but its label
does not prominently state "imitation", (3) packaged in a
misleading container, (4) in package form and does not have
appropriate labels, (5) not appropriately labeled in accordance
with the applicable provisions of the FFDCA, (6) labeled in such

11

a way that it misrepresents standards of quality or container
fill, (7) not labeled by its common or usual name, (8) a product
containing artificial flavoring, coloring, or preservatives but
does not indicate this on its label, and (9) not in compliance
with food allergen labeling requirements.  21 U.S.C. § 343-1(b)-
(f), (h), (i)(1), (k), (w), and (x).

Snapple argues that the above provisions expressly preempt
Plaintiff's claims, which pertain to the labeling of flavors as
ingredients, artificial flavors, and the common or usual names of
foods.  (Snapple Br., at 14-16.)  Snapple notes, in support of
this argument, that (1) Plaintiff does not allege that Snapple
failed to comply with the FFDCA's labeling requirements, and (2)
the FFDCA expressly precludes private rights of action.  (Id.)
Snapple also argues that the enormity and comprehensive nature of
both the FFDCA and its implementing regulations suggests that
Congress intended to fully occupy the food and beverage labeling
field, and thus, Plaintiff's claims are impliedly preempted.
(Id. at 16.)  Snapple similarly contends that Plaintiff's claims
are impliedly preempted because they stand as obstacles to
accomplishing the purposes underlying the FFDCA.  (Id. at 18-21.)
Finally, Snapple argues that if this Court concludes that any of
Plaintiff's claims are not preempted, the Court should still
dismiss such claims under the primary jurisdiction doctrine
because they "involve the 'resolution of issues which, under a

regulatory scheme, have been placed within the special competence of federal agencies'". (Id. at 21-28.)[2]

   Plaintiff, in contrast, argues that Snapple has not established that the FDA's regulations apply to Plaintiff's claims, particularly insofar as they concern the term "All Natural", and thus, such claims are not expressly preempted by the FFDCA or its corresponding regulations. (Pl. Br., at 9-10.) Plaintiff also argues that the language of Section 343-1, the FFDCA's preemption provision, "would simply be surplus, if Congress had intended to occupy the entire field of food and beverage labeling." (Id. at 10.) Moreover, Plaintiff contends that her claims are not impliedly preempted because, inter alia, (1) states have always had a legitimate interest in protecting consumers from fraud with respect to the sale of food products, (2) the FFDCA leaves substantial portions of the food and beverage labeling field vacant, including the areas at issue here, and (3) no actual conflict exists between the FDA's regulations and the state common laws Plaintiff seeks to enforce. (Id. at 12-15.)  Last, with respect to Snapple's alternatI've

_____

   [2] With respect to the specific causes of action Plaintiff asserts, Snapple argues that (1) Plaintiff cannot establish her consumer fraud claim because she cannot show any actionable misrepresentation, ascertainable loss, or causation, (2) the amended complaint fails to satisfy Rule 9(b), and (3) Plaintiff has failed to state a claim for unjust enrichment or breach of the express or implied warranty of merchantability. (Id. at 28-40.)

argument, Plaintiff contends that the doctrine of primary jurisdiction is inapplicable here because (1) the questions at issue are within the conventional experience of judges, and are not particularly within the FDA's discretion, (2) the FDA previously considered the issues presented, and (3) there is no substantial danger of inconsistent rulings.  (Id. at 15-22.)

The Court agrees with Plaintiff that Congress has not explicitly preempted Plaintiff's claims by inserting any specific preemptive language into the FFDCA that covers such claims, including the provisions contained in section 343-1 set forth above.[3]  (See Pl. Br., at 6, 9-10.)  The Court also agrees with Plaintiff that states have a legitimate interest in protecting their consumers against deception and fraud in the sale of food and beverages.  (See id. at 12.)  See Fla. Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 144 (1963).  Nevertheless, the Court finds that Plaintiff's claims in this case are impliedly preempted by the detailed and extensive regulatory scheme established by the FFDCA and the FDA's implementing regulations.  See Geier v. Am. Honda Motor Co., Inc., 529 U.S. 861, 884-85 (2000) (explaining that preemption can be inferred

---

[3] The Court acknowledges, however, that Snapple's express preemption arguments were directed at Plaintiff's claims concerning the fruit juices contained in Snapple beverages, which Plaintiff has withdrawn.  (See Snapple Reply Br., at 1 n.1; Pl. Br., at 3 n.3.)

from a comprehensive regulatory scheme even when there has been no formal agency statement of preemptive intent).

As discussed in detail above, the FDA, under the broad authority granted to it by the FFDCA, has promulgated comprehensive regulations pertaining to, inter alia, (1) naming beverages containing fruit or vegetable juice, (2) listing juices on the label of a diluted multiple juice drink or a blend of single-strength juices, (3) the common or usual name for diluted multiple-juice beverages or a product containing a blend of single-strength juices, (4) label depictions by "vignette or other pictorial representation" on products that have been either modified such that the original juice is not recognizable when processing is complete, or diminished of nutrients, and (5) naming juices made completely or partially from concentrate.  21 C.F.R. § 1.1 et seq.; 21 C.F.R. § 102.33(a)-(g).  Further, the FDA requires all beverages purporting to contain fruit or vegetable juice, though their name, label, or a pictorial representation, to prominently declare, with certain exceptions, the percentage of fruit or vegetable juice, whether it contains less than 1% of a particular juice, and whether it contains 100% juice with other added ingredients, preservatives, or sweeteners. 21 C.F.R. § 101.30(a)-(g).  Thus, the FDA has carefully balanced beverage industry and consumer interests and created a complex regulatory framework to govern beverage labeling.

15

Although the FDA has declined to undertake rulemaking to establish a definition for the term "natural", the FDA has specifically defined the term "natural flavor".  See 21 C.F.R. § 101.22(a)(3); see also 58 Fed. Reg. 2302, 2407 (Jan. 6, 1993). (See Def. Br., Ex. C, 12-12-05 FDA Letter to Zamora, at 1-2.) Also, the FDA has a current published policy regarding the term "natural".  Specifically, it has decided (1) not to restrict the use of the term, except for added color, synthetic substances, and flavors, and (2) to construe it as meaning that "nothing artificial or synthetic (including all color additives regardless of source) has been included in, or has been added to, a food that would not normally be expected to be in the food."  58 Fed. Reg. at 2407.  Thus, the FDA has in fact contemplated the appropriate use of the term "natural" in connection with foods and beverages.  See id.  (See Def. Br., Ex. C, 12-12-05 FDA Letter to Zamora, at 1-2.)

The FDA has the ability to enforce the FFDCA and its myriad of corresponding regulations pertaining to beverage labels by, inter alia, recalling products that violate its provisions or seeking a judicial order enjoining such products.  See 21 U.S.C. § 332; 21 C.F.R. § 7.40.  Additionally, the FDA is obligated to follow its advisory opinions, including its statements and position on the use of the term "natural", until such opinions or positions are amended or revoked.  See 21 C.F.R. § 10.85(e).

16

Accordingly, for all of the above reasons, the Court concludes that the FFDCA and FDA regulations so thoroughly occupy the field of the beverage labeling at issue in this case that it would be unreasonable to infer that Congress intended states to supplement this area.  See C.E.R. 1988, Inc., 386 F.3d at 269.  Thus, this Court will not determine "that which the FDA, with all of its scientific expertise, has yet to determine", namely how the terms "natural" or "all natural" should be defined and whether either may be used on the label of a beverage containing HFCS.  See Sandoz Pharm. Corp. v. Richardson-Vicks, Inc., 902 F.2d 222, 231-32 (3d Cir. 1990) (refusing to find that the defendant's listing of demulcents as inactive on the label of its pediatric cough syrup was literally false, and ultimately concluding that the issue of whether an ingredient is properly labeled as active or inactive under FDA standards "is not properly decided as an original matter by a district court in a Lanham Act case"); Cohen v. McDonald's Corp., 808 N.E.2d 1, 10 (Ill. App. Ct. 2004) (holding that the plaintiff's cause of action was preempted because it essentially asked the court "to fill holes in" the National Labeling and Education Act, 21 U.S.C. § 341 et seq., when the FDA had yet to do so).  Instead, this Court will allow the FDA, which has already set forth specific requirements for what must be included on beverage labels, to decide whether such a determination is necessary and warranted.

17

We note that because "agency decisions are frequently of a discretionary nature or frequently require expertise, the agency should be given the first chance to exercise that discretion or to apply that expertise." Sandoz Pharm. Corp., 902 F.2d at 231. Determinations regarding what should or should not be permitted on a beverage label are clearly within the expertise of the FDA, which has already expended tremendous resources and time considering this "field" and its impact on public health and safety. Compare Animal Legal Def. Fund Boston, Inc. v. Provimi Veal Corp., 626 F.Supp. 278, 281-284 (D. Mass. 1986) (concluding that the plaintiff's claim that a consumer protection statute required the defendant to disclose how the calves used in its products were raised was preempted by the federal scheme regulating the labeling, packaging, and marketing of meat and the use of medicated animal feeds, which scheme was intended to protect the health and welfare of consumers), and English, 496 U.S. at 79 (concluding that the plaintiff's intentional infliction of emotional distress claim did not fall within the preempted field of nuclear safety as that field had been defined in previous cases).

The Court therefore concludes that Plaintiff's state law claims are preempted because they require the Court to regulate conduct in a field, i.e., beverage labeling as discussed in this case, that Congress intended the federal government to occupy

18

exclusively.  See English, 496 U.S. at 79; Lindsay, 480 F.3d at
205.  Indeed, this Court finds that permitting states through
statutes or common law causes of action to impose additional
limitations and requirements on beverage labels such as described
here would create obstacles to the accomplishment of Congress's
objectives in enacting the FFDCA and placing all authority to
enforce and implement that statute with the FDA.  See Geier, 529
U.S. at 865, 881 (holding that the plaintiff's tort-law claim
that the defendant auto manufacturer should have equipped a
vehicle with airbags would have stood as an obstacle to the
accomplishment of important federal objectives under the Federal
Motor Vehicle Safety Standard Act); see also English, 496 U.S. at
79; Lindsay, 480 F.3d at 205-06; C.E.R. 1988, Inc., 386 F.3d at
269; PA Employees Benefit Trust Fund, 499 F.3d at 247.[4]  Thus,
the Court holds that Plaintiff's claims are impliedly preempted.[5]

---

[4] Our holding does not, as Plaintiff contends, imply that
this Court believes that in enacting the FFDCA Congress intended
to displace all state regulation of foods and beverages.  In
contrast, we simply find that Plaintiff's claims, which pertain
to labeling of the described beverages only, are impliedly
preempted by the statutory scheme created by the FFDCA and its
implementing regulations.

[5] Because we have found that Plaintiff's claims are
impliedly preempted, we need not address the applicability of the
primary jurisdiction doctrine or the actual merits of Plaintiff's
claims.

**CONCLUSION**

The Court, for the reasons stated <u>supra</u>, will grant Snapple's motion to dismiss.  The Court will issue an appropriate order and judgment.


        <u>  s/ Mary L. Cooper       </u>
        **MARY L. COOPER**
        United States District Judge


Dated: <u>June 12, 2008</u>