# Exhibit 1A
## to Bryan Mazur's Declaration

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| STACY HOLK, on behalf of herself and all others similarly situated,<br><br>    Plaintiff,<br><br>v.<br><br>SNAPPLE BEVERAGE CORPORATION,<br><br>    Defendant. | Civil Action No. 3:07-cv-03018-MJC-JJH |

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| EVAN WEINER and TIMOTHY McCAUSLAND, on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br><br>v.<br><br>SNAPPLE BEVERAGE CORPORATION,<br><br>    Defendant. | CIVIL ACTION<br><br>Civil Action No. 1:07-cv-08742 (DLC) |

## EXPERT REPORT OF MICHAEL B. MAZIS, PH.D.

**April 5, 2010**

CONFIDENTIAL

## SUMMARY OF EXPERT OPINION

1.      I was engaged by Baker Botts L.L.P., counsel for Snapple Beverage Corporation, in connection with the class action complaints filed by Stacy Holk in the case styled *Stacy Holk v. Snapple Beverage Corporation*, No. 3:07-cv-03018-MJC-JJH, in the United States District Court for the District of New Jersey,[1] and by Evan Weiner and Timothy McCausland in the case styled *Weiner v. Snapple Beverage Corporation*, No. 1:07-cv-08742 (DLC), in the United States District Court for the Southern District of New York.[2]  I have been asked to provide my opinions on whether the words "all natural" on Snapple product labels and in Snapple advertising played a significant or meaningful role in consumers' decisions to buy Snapple beverages, and on whether there is significant or meaningful variation in the reasons why consumers purchase Snapple products.

2.      It is my opinion that the words "all natural" on Snapple product labels and in Snapple advertising (to the extent the words were even used) did not play a significant or meaningful role in consumers' decisions to buy Snapple products with high fructose corn syrup ("HFCS") during the Class Period.[3]  In addition, it is my opinion that individual

---

[1] Second Amended Class Action Complaint filed on December 28, 2009 ("NJ Complaint").  The original complaint was filed on June 29, 2007.

[2] Second Amended Class Action Complaint filed on September 25, 2009 ("NY Complaint").  The original complaint was filed on October 10, 2007.

[3] In the NJ Complaint, Ms. Holk defines the proposed class as consisting of "[a]ll persons in the State of New Jersey who purchased a Snapple beverage marketed, advertised and promoted as 'All Natural,' but that contained HFCS during the six (6) years prior to the commencement of suit until such time as Defendant ceased said practice."  NJ Complaint ¶ 12.  Ms. Holk filed her lawsuit on June 29, 2007.  Accordingly, by her definition, the class period in the New Jersey lawsuit begins on June 29, 2001.  Similarly, in the NY Complaint, Mr. Weiner and Mr. McCausland define the proposed class as consisting of "[a]ll persons residing in, or who purchased a Snapple Beverage in, the State of New York, who purchased for personal consumption and not for resale a Snapple beverage marketed, advertised and promoted as 'All Natural,' but that contained HFCS or other unnatural ingredients, during the six (6) years prior to the commencement of suit until such time as Defendant reforms said practice."  NY Complaint ¶¶ 15-16.  Mr. Weiner and Mr. McCausland filed their lawsuit on October 10, 2007.  Accordingly, by their definition, the class period in the New York lawsuit begins on October 10, 2001.  In the Motion for Class Certification filed by Mr. Weiner and Mr. McCausland, they allege that Snapple began selling tea and juice drink beverages bearing "All

CONFIDENTIAL

consumers purchased Snapple products with HFCS during the Class Period for many different reasons.  Almost all of these reasons related to something other than a preference or desire for natural products.  My conclusions are supported on four separate grounds.

3. 

4.      Second, my review of Snapple advertising during the Class Period reveals that "all natural" messaging played almost no role in Snapple's advertising.  "All natural" messages were not featured prominently, if at all, in Snapple radio, television and outdoor advertisements during the Class Period.

---

Natural" labeling without HFCS on January 1, 2009.  (Plaintiffs' Memorandum of Law in Support of Their Motion for Class Certification, No. 07-cv-08742-DLC (S.D.N.Y.) [hereinafter, "Motion for Class Certification"]).  Thus, for purposes of this report, I define the "Class Period" as the period of time from June 29, 2001, to January 1, 2009.

CONFIDENTIAL

████████████████████████████████████████████████

████████████████████████████████████████████████

5.      Third, evidence of varying perceptions of "natural" suggests that consumers hold many different opinions regarding the meaning of that term or (in some cases) no opinion at all.  The Named Plaintiffs[4] have testified that their personal definitions of "natural" are based on their own individual opinions and may not be shared by others.  In addition, the U.S. Food and Drug Administration (FDA) has refused to issue a formal regulation defining "natural," noting that defining "natural" is a complex task and that "there are many facets of the issue that the agency will have to carefully consider" before undertaking formal rulemaking.  Nonetheless, the FDA has followed a consistent policy regarding the meaning of "natural" for nearly 20 years and has issued at least two letters stating that it would not object to use of the term "natural" on the labeling of foods containing HFCS, provided that the HFCS was made in a specific way.

6.      Fourth, deposition testimony of the Named Plaintiffs demonstrates that they considered numerous characteristics of Snapple other than "all natural" when making their purchases.  Indeed, one of the Named Plaintiffs would have chosen Snapple over its competitors even if Snapple had not been labeled "all natural," and another did not list "all natural" among his primary reasons for purchasing Snapple beverages.  The testimony of the Named Plaintiffs illustrates that any given consumer may attach varying degrees of importance to "all natural," including no importance at all, when purchasing a Snapple beverage.

---

[4] Throughout this report, I refer to plaintiffs Holk, McCausland and Weiner collectively as the "Named Plaintiffs."

CONFIDENTIAL

**"ALL NATURAL" IS NOT A PRIMARY MOTIVATING FACTOR IN CONSUMER PURCHASE AND CONSUMPTION OF SNAPPLE PRODUCTS**



CONFIDENTIAL



10.

CONFIDENTIAL

11.  ████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████████████████████

12.  ████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████████████████████████

**SNAPPLE'S MARKETING MIX DID NOT EMPHASIZE "ALL NATURAL"**

13.      Snapple's product advertisements during the Class Period consistently emphasized such characteristics as taste, variety of flavors and fun and quirky personality.[8] "All natural" was not the focus of Snapple's radio, television or outdoor print advertisements during the Class Period. ████████████████████████████████

████████████████████████████████████

███████████████████████████████████

**Snapple's Radio, Television and Outdoor
Advertising Did Not Emphasize "All Natural"**

---

[7] SN0003575.

[8] As an initial matter, I note that each of the Named Plaintiffs have testified that they did not base their decisions to purchase Snapple on Snapple's advertising.  *See* Deposition of Stacy Holk, pp. 308:22-309:9, 313:14-18; Deposition of Timothy McCausland, pp. 288:23-289:18; Deposition of Evan Weiner, p. 187:5-18.

7

14.    None of Snapple's radio, television and outdoor print advertisements that I reviewed emphasized "natural" or "all natural."[9]  Rather, Snapple's advertising during the Class Period was focused primarily on promoting the brand through humor.

15.    The Snapple advertising that I reviewed emphasized five major themes.  In 2001, television commercials emphasized that Snapple's beverages were fruity.  The humorous commercials showed various fruits joining together under the auspices of a fictional director of fruit relations.  "All natural" was not emphasized.  In 2002 and 2003, quirky television commercials showed Snapple bottles dressed with wigs and hats engaging in activities such as break dancing, line dancing, synchronized swimming, running from guinea pigs and performing rock music.  Messaging focused on "all natural" was not emphasized in these commercials.

16.    From 2003 through 2005, Snapple focused on various promotions through its bottle caps and website.  Participating Snapple drinkers could earn prizes.  In 2006 and 2007, Snapple responded to consumers' desire for more healthful beverages by introducing a new line of lighter teas with fewer calories.  Television and radio advertisements focused on Snapple's new line of white, red, green and black teas.  Finally, in 2008 and 2009, Snapple's advertising campaign featured its new line of enhanced water products and Snapple Cap Facts.[10]  None of these television and radio commercials emphasized that Snapple with HFCS was "all natural."

---

[9] My review included over 20 Snapple television commercials, 40 Snapple radio commercials, and various Snapple outdoor advertisements.

[10] I understand that Snapple's launch of a line of white, red, green and black teas does not contain HFCS and therefore is not at issue in the New York and New Jersey lawsuits.  In addition, I understand that Snapple's enhanced water products are similarly not at issue in the New York and New Jersey lawsuits.

CONFIDENTIAL

17.     Similarly, the Snapple outdoor advertising that I reviewed did not promote Snapple beverages as "all natural."  Many of the advertisements promoted a free summer concert series in New York City's Central Park that was sponsored by Snapple.[11]  Those ads made no mention of Snapple as "all natural."  Some of the others showed pictures of Snapple bottles but did not emphasize Snapple as an "all natural" beverage.[12]

### Snapple's Marketing Strategy Did Not Emphasize "All Natural"

18.     My review of Snapple marketing and strategy documents from the Class Period reveals that Snapple did not seek to emphasize "all natural" in its marketing and advertising efforts. ███████████████████████████

███████████████████████████████████████████████████████

██████████████████████████    ████████████████████████

████████████████████████████████████████████████

19.     This theme is reflected in a variety of other Snapple documents. ███

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████,[16]

---

[11] SN0002551, 2553-2555.

[12] SN0002477, 2550, 2552.

[13] SN0002320.

[14] SN0002349.

[15] SN0002399, 2410. ███████████████████████████████  When faced with a large number of product choices in the refrigeration aisle of a convenience store or at a supermarket, a brand-loyal consumer may select a specific brand without even considering the alternative value propositions of its competitors.

[16] SN0002129.

9

CONFIDENTIAL

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████

20.    The Named Plaintiffs have submitted the Expert Report of Alan G. Goedde, Ph.D.  Using excerpts from only two Snapple marketing and strategy documents, Dr. Goedde argues that Snapple sought to position its products for success in the market by emphasizing their "all natural" characteristics.  Dr. Goedde fails to place these excerpts in proper context, giving the impression that Snapple placed an inordinate focus on "all natural."  In actuality, Dr. Goedde has ignored the competitive reality of Snapple in the competitive tea and juice drink markets.  The documents that I have reviewed demonstrate that Snapple has historically positioned its brand and its customer message on taste, variety, and a fun and quirky personality.  Snapple "Real Facts" printed on Snapple bottle caps are one example of this fun and quirky approach to promoting Snapple.  ██████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████    Read in their entirety, the Snapple documents cited by Dr. Goedde

---

[17] SN0003100.

[18] SN0003193.

10

CONFIDENTIAL

demonstrate that "all natural" was a relatively minor marketing consideration for Snapple during the Class Period.

21.     For example, in his report, Dr. Goedde cites to one of his two Snapple documents to assert that ███████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ To that end, Dr. Goedde argues that Snapple has sought out a category of consumers who "place a value on and seek out products that are all natural and not artificial."[20]   Dr. Goedde bases these statements on snippets ███████████████████████████████████████ █████████████████████████████████████████ The document relates to ████████████████████████████████████████████████████████████████████████ ████████████████████████████ The first page that Dr. Goedde cites doesn't even mention Snapple: it describes ways that juice brands other than Snapple ████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ██████████████████████████

22.     Dr. Goedde also cites to a different page of the "Snapple Juice & Juice Drink Dialogue" document for the proposition that Snapple seeks to attract consumers who

---

[19] Expert Report of Alan G. Goedde ("Goedde Report") ¶ 12.

[20] *Ibid.*

[21] SN0000915.

[22] SN0000944.

[23] *Ibid.* (emphasis added). █████████████████████████████████ ████████████████████████████████████████████████████████

11

CONFIDENTIAL

seek out "all natural" beverages.[24]



23.    Dr. Goedde also asserts in his report that "Snapple's own pricing strategy recognizes that 'All Natural Positioning' is a success factor resulting in customers paying a premium for the product."[27]  The Snapple document to which Dr. Goedde refers, however,

_____

[24] SN0000949.

[25] SN0000952, 955.

[26] *See* SN0000947, 949.

[27] Goedde Report ¶ 13.

[28] SN0003077-3080.

[29] *Ibid.*

[30] *Ibid.*

CONFIDENTIAL

24.     In my opinion, Dr. Goedde has also failed to identify any workable mechanism for determining, on a class-wide basis, whether potential members of the proposed classes in New York and New Jersey purchased Snapple because of the words "all natural" on Snapple's labeling and in its advertising.   He appears to assume that snippets taken from the two Snapple documents he reviewed establish that the purchasers of its products were uniformly motivated by a desire for "all natural" beverages.   As discussed above and in the following sections of this report, any such assumption is unwarranted both in light of Snapple's documents and the empirical data ████████

████████████████████████████████████████████████████████████

████████████████████████████

25.     The Plaintiffs in the New York litigation likewise over-emphasize the role of "all natural" in Snapple's internal marketing plans.   In their Motion for Class Certification, the NY Plaintiffs state that "all natural" was part of Snapple's "core image," was an "important product attribute of Snapple beverages," and was used to "build a brand around the proposition."[32]   However, the snippets of information presented in the Motion do not portray accurately the role of "all natural" in the marketing of Snapple from 2001 to 2009.

26.     ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

---

[31] SN00003081, 3093-3094.

[32] Motion for Class Certification at 3.

13

CONFIDENTIAL



There is scant mention of "all natural" throughout the document. This is consistent with the Snapple advertising and marketing materials I have reviewed and the studies I have examined.

27.

---

[33] *Ibid.* at 2.

[34] SN0002557.

[35] SN0002635.

[36] Complaint at 3.

[37] SN0002129.

14

CONFIDENTIAL



28.    In addition, the Motion for Class Certification includes incorrect information from Snapple's 2006 marketing plan. ████████████████████████

████████████████████████████████████

████████████████████    ████████████████████████

████████████████████████████████████

████████████████████████████████

29.    ████████████████████████████████

████████████████████████████████████

████████████████████    ████████████████████

████████████████████████████████████

---

[38] SN0002130.

[39] SN0002134.

[40] Motion for Class Certification, at 3.

[41] Motion for Class Certification, at 3.

15

CONFIDENTIAL



**THERE ARE VARYING PERCEPTIONS OF "NATURAL"**

31.     In the NY and NJ Complaints, the Named Plaintiffs allege that the phrase "all natural" refers to products that do not have "any chemically altered or man-made ingredients" and that undergo minimal processing.[45]  Thus, the Named Plaintiffs appear to believe that "natural" is associated with products that exist in nature and have undergone minimal processing.  Applying their definition, the Named Plaintiffs assert that Snapple beverages containing HFCS should not have been labeled "all natural" because HFCS is highly processed, chemically-altered, and man-made.

32.     Despite the fact that the Named Plaintiffs claim to have developed opinions that HFCS is not natural, there are varying views among the public as to what constitutes a

---

[42] SN0003080.

[43] SN0003091.

[44] *Ibid.*

[45] NJ Complaint at 1; NY Complaint at 2.

CONFIDENTIAL

"natural" product and whether HFCS fits within that definition. Indeed, the Named Plaintiffs have admitted that their definition of "natural" is merely their "opinion" and may not be shared by others.[46] Weiner, for example, testified that his opinion as to the meaning of "natural" was informed by his "reading," "experience," "personal views," and listening to conversations that he overheard.[47]

33.    The FDA's historical approach to "natural" reflects the varying views among the public as to the meaning of that term. In 1991, the FDA called for comments about whether to promulgate a regulation to adopt a uniform definition of the term "natural." At the time, FDA had a policy to view "natural" as meaning "that nothing artificial or synthetic (including colors regardless of source) is included in, or has been added to, the product that would not normally expected to be there."[48] The FDA noted that the Federal Trade Commission (FTC) had issued two reports citing "numerous studies indicating a general lack of consumer understanding and scientific agreement about the meaning of the term."[49]

34.    In 1993, FDA reported on the comments received from the public, consumer groups, and industry. The agency noted the "wide range of ideas" that it had received on the issue of developing a definition for "natural." Some comments recommended, for example, prohibiting the terms "natural" or "all natural." Others felt

---

[46] Deposition of Stacy Holk, p. 195:6-17; Deposition of Timothy McCausland, pp. 188:4-17, 190:4-12; Deposition of Evan Weiner, pp. 95:22-24, 97:16-98:24.

[47] Deposition of Even Weiner, pp. 97:16-98:20.

[48] 56 FR 60421, 60467 (Nov. 27, 1991). The FDA also noted that when it had published an advance notice of proposed rulemaking in 1989 announcing a major initiative to look at food labeling, it had received 450 comments addressed to the terms "light," "fresh," and "natural." *Id.* at 60421-22.

[49] *Ibid.*

CONFIDENTIAL

that "natural" should apply to those foods that do not contain artificial or synthetic ingredients. Other comments suggested that processing should not necessarily preclude a product from being deemed "natural." Additional comments focused on appropriate ways to define "minimal processing." In the end, the FDA determined that defining "natural" was extremely complex, and it opted to maintain its current policy of not restricting "the use of the term 'natural' except for added color, synthetic substances, and flavors . . . ."[50]

35.      In 2008, the FDA applied its policy regarding natural to find unobjectionable the labeling as natural of foods containing specific types of HFCS. In a letter to the president of the Corn Refiners Association, FDA's Geraldine A. Jones wrote that, based on the FDA's policy on natural and its understanding of the manufacturing process generally used to make HFCS, it "would not object to use of the term 'natural' on a product containing HFCS . . . ."[51]

36.      Thus, there does not appear to be a uniform understanding of the term "natural" based on comments received by FDA from a wide variety of sources. Nonetheless, for nearly twenty years, the FDA has consistently followed a policy to consider a "natural" product as one containing no artificial or synthetic ingredients. The FDA policy is at variance with the Plaintiff's Second Amended Complaint that views a "natural" product as one that has undergone minimal processing.

### THE NAMED PLAINTIFFS TESTIFIED THAT THEY PURCHASED SNAPPLE PRODUCTS FOR A VARIETY OF REASONS.

37.      The Named Plaintiffs testified that they purchased Snapple beverages with HFCS for a variety of reasons, including taste, Snapple's humorous marketing, and brand

---

[50] 58 Fed. Reg. 2302, 2407 (Jan. 6, 1993).

[51] SN0001587-1588.

18

CONFIDENTIAL

loyalty.  Each plaintiff testified that "all natural" was not the "primary" or "deciding" factor in his or her decision to purchase Snapple. ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████

38.    Plaintiff Stacy Holk testified that when she purchased a Snapple Acai Blackberry juice drink in May of 2007, she based her purchasing decision on the Snapple brand name, her desire to try something "different," Snapple's "clever" marketing, Snapple's interesting "Snapple facts," the fact that she could recycle Snapple's glass bottle, taste, and her desire for a "change-up in taste" from water.[52]  She did not purchase the beverage solely because of "all natural" labeling.[53]  In fact, she testified that during the Class Period, she would have "bought Snapple even if it [were] labeled as something other than all natural."[54]

39.    Plaintiff Timothy McCausland testified that he was attracted to different types of teas, including Lipton, Nestea, Snapple, and others based on "[t]aste," "marketing," "[p]erception of value and quality," and the fact that Snapple was a "local New York-bred kind of story."[55]  He was also attracted to Snapple because it was sold in

---

[52] Deposition of Stacy Holk, pp. 260:13 - 262:17; *see also ibid*. at p. 319:6-21 (purchased Snapple because she "liked the brand," "liked to drink the tea," "liked that it was in glass," it was a "fun to drink beverage," and "it tasted good").

[53] *Ibid* at p. 260:13-17.

[54] *Ibid*. at pp. 318:23 - 319:5.

[55] Deposition of Timothy McCausland, p. 229:9-21.

CONFIDENTIAL

glass containers.[56]  Although "all natural" status was a factor in his purchasing decision, it was not the "deciding factor."[57]

40.    Plaintiff Evan Weiner testified that he preferred Snapple over Lipton, Nestea and Arizona because Snapple had a greater variety of flavors in iced tea and juice drinks.[58]  He enjoyed Snapple because it "tasted better," offered good flavors, and was cold and refreshing.[59]  When he purchased a Snapple Acai Blackberry juice drink in Penn Station after attending a circus at Madison Square Garden, he based his purchase on such factors as taste, beverage temperature, and brand loyalty.[60]  Indeed, he testified that the three "primary" reasons why he purchased Snapple were taste, brand loyalty, and hydration.[61]

41.    The testimony of the Named Plaintiffs reinforces that Snapple consumers purchased Snapple for a variety of reasons, most of which had nothing to do with "all natural."  In addition, it further validates Snapple's decision to emphasize attributes other than "all natural" in its Class Period advertising.

## CONCLUSIONS

42.    Based on the analyses set forth above, it is my opinion that (1) the words "all natural" on Snapple product labels and in Snapple advertising did not play a significant or meaningful role in consumers' decisions to buy Snapple products with high

---

[56] *Ibid.* p. 123:9-18.

[57] *Ibid*. p. 221:14-23.

[58] Deposition of Evan Weiner, p. 131:14-23.

[59] *Ibid.* at pp. 133:15 - 134:11.

[60] *Ibid.* at pp. 143:10 - p. 144:20.

[61] *Ibid*. at p. 163:3-14.

CONFIDENTIAL

fructose corn syrup ("HFCS") during the Class Period, and (2) individual consumers purchased Snapple products with HFCS during the Class Period for many reasons other than a preference or desire for natural products.

## SUMMARY OF QUALIFICATIONS AND EXPERIENCE

43.     I am Professor Emeritus of Marketing at American University's Kogod School of Business.  I was a faculty member at American University for 28 years, and I served over 10 years as chair of the marketing department.  I have taught courses in consumer behavior, marketing research, marketing principles, marketing management, Internet marketing, and marketing and public policy.  I have conducted marketing research surveys for over 35 years.  A detailed description of my professional qualifications is attached to this report as Exhibit A.

44.     I received my B.S. degree in Economics from the University of Pennsylvania, my M.B.A. degree from New York University, and my Ph.D. degree in Business Administration from Pennsylvania State University.  I was editor of the *Journal of Public Policy & Marketing* from 1992 to 1995, and I was Associate Editor of *The Journal of Consumer Affairs* from 1998 to 2001.

45.     I have published over 60 articles in academic journals, including *Journal of Marketing*, *Journal of Consumer Research*, *Journal of Marketing Research*, *Journal of Public Policy & Marketing*, *The Journal of Consumer Affairs*, *Journal of Personality and Social Psychology*, *Journal of Experimental Social Psychology*, and *Journal of the American Medical Association*.

46.     From 1976-79, I served as an in-house marketing expert at the FDA and at the FTC, where I evaluated consumer perception of advertising and product labels and designed and conducted marketing research surveys, which included the evaluation of

CONFIDENTIAL

consumer reaction to various types of information. I served as the FTC's principal marketing witness in *FTC vs. Novartis* in 1997, *FTC vs. Trans Union* in 1998, *FTC vs. Mercury Marketing* in 2003, and *FTC vs. Telebrands* in 2004. In addition, I have served as a consultant on marketing issues for the FDA, Consumer Product Safety Commission, Department of Justice, Federal Deposit Insurance Corporation, Bureau of Tobacco, Alcohol, and Firearms, U.S. Mint, and the states of California and Vermont. A list of the cases in which I have testified in the last four years is attached as Exhibit B.

## DOCUMENTS CONSIDERED

47.     A list of the documents I have considered in preparing this report and forming the opinions stated herein is attached to this report as Exhibit C.

## COMPENSATION

48.     My work on this case is being billed at $600 per hour. My compensation is not dependent upon the opinions I reach or the outcome of the litigation; I have no personal financial stake in the outcome of the litigation.

Michael B. Mazis, Ph.D.                              April 5, 2010
                                                     Date

22

CONFIDENTIAL

April 2010

# EXHIBIT A

# MICHAEL B. MAZIS

## ADDRESS

9805 Sotweed Drive
Potomac, MD 20854
(301) 983-9048 (Tel)
(301) 983-2583 (Fax)
e-mail address: mmazis@american.edu

## EDUCATION

B.S. in Economics, June, 1964
University of Pennsylvania, Wharton School

Master of Business Administration (M.B.A.) June 1966
New York University, Graduate School of Business Administration

Ph.D. in Business Administration, December 1971
The Pennsylvania State University
Major Field: Marketing
Minor Fields: Social Psychology/Quantitative Business Analysis

## PROFESSIONAL POSITIONS

Professor Emeritus of Marketing, June 2008 to present
Professor of Marketing, August 1981 – May 2008
Chair, Department of Marketing, June 1980 - August 1989; May 1998 - May 1999;
        September 2004 - August 2006
Associate Professor of Marketing, September 1979 - August 1981
The American University
Kogod School of Business
Washington, D.C.

Chief, Marketing and Consumer Research, July 1977 - August 1979
Office of Policy Planning and Evaluation
Federal Trade Commission
Washington, D.C.

CONFIDENTIAL

Resident Consultant, February 1977 - July 1977
Division of National Advertising
Bureau of Consumer Protection
Federal Trade Commission
Washington, D.C.

Economist, June 1976 - February 1977
Division of Drug Advertising
Bureau of Drugs
Food and Drug Administration
Rockville, Maryland

Associate Professor of Marketing, September 1974 - June 1976
Assistant Professor of Marketing, September 1971 - August 1974
University of Florida
Gainesville, Florida

Marketing Research Analyst, September 1965 - August 1968
Warner-Lambert Pharmaceutical Company
Morris Plains, New Jersey

## EDITORSHIPS

Editor, ***Journal of Public Policy & Marketing***, 1992-1995.

Michael B. Mazis., ed., ***Journal of Public Policy & Marketing***, Vol. 10 (Number 1, 1991), special conference issue.

Associate Editor, ***The Journal of Consumer Affairs***, 1998-2001.

Michael B. Mazis, ed., Proceedings of 1982 American Psychological Association Conference, Division 23 (Consumer Psychology).

Louis Morris, Michael Mazis and Ivan Barofsky, eds., ***Product Labeling and Health Risks***, Banbury Center, Cold Spring Harbor Laboratory, New York, 1980, 328 pages.

CONFIDENTIAL

GRANTS

Michael B. Mazis, "Evaluating Health Warning Labels for Alcoholic Beverages," National Institute on Alcohol Abuse and Alcoholism, September 1989-September 1992 ($700,000) and grant supplement, 1990-1992 ($65,000).

Michael B. Mazis, "Marketing and Public Policy: Issues for the 1990's," American Marketing Association, to fund workshop in Washington, D.C., August 1990 ($500).


PROFESSIONAL PUBLICATIONS

1. Stephen Miller, Michael B. Mazis and Peter L. Wright, "Perceptual Distortion in the Development of Brand Attitudes: A Cognitive Model," in David L. Sparks (ed.), *Broadening the Concept of Marketing*, American Marketing Association, 1970, p. 119 (abstract).

2. Michael B. Mazis and Robert Green, "Implementing Social Responsibility," *MSU Business Topics*, Vol. 13 (Winter 1971), pp. 68-76 (Reprinted in W. P. Anthony, J.B. Haynes and P. L. Wilkens (eds.) *Social Responsibility of Business*, General Learning Press, 1972 and A.B. Carroll (ed.), *Managing Corporate Social Responsibility* Little, Brown and Company, 1977).

3. Stephen Miller, Michael B. Mazis, and Peter L. Wright, "The Influence of Brand Ambiguity on Brand Attitude Development," *Journal of Marketing Research*, Vol. 8 (November 1971), pp. 447-9.

4. Michael B. Mazis, "Decision-Making Role and Information Processing," *Journal of Marketing Research*, Vol. 9 (November 1972), pp. 447-9.

5. Michael B. Mazis, and Timothy W. Sweeney, "Novelty and Personality with Risk as a Moderating Variable," in Boris W. Becker and Helmut Becker (eds.) *Marketing Education and the Real World*, American Marketing Association, 1972, pp. 406-11.

6. Michael B. Mazis and R. Eugene Klippel, "Variable Modular Testing:  A New Method for Increasing Student Motivation and Learning in Large Classes," in Boris W. Becker and Helmut Becker (eds.), *Marketing Education and the Real World*, American Marketing Association, 1972.

7. Michael B. Mazis and Robert B. Settle, "Consumer Reaction to Restriction of Choice Alternatives," in M. Venkatesan (ed.), *Proceedings*, Third Annual Association for Consumer Research Conference, 1972, pp. 417-27.

CONFIDENTIAL

8.  Michael B. Mazis and Marilyn Beutenmuller, "Attitudes Toward Women's Liberation and Perception of Advertisements," in M. Venkatesan (ed.), ***Proceedings***, Third Annual Association for Consumer Research Conference, 1972, pp. 428-35.

9.  Michael B. Mazis, "Cognitive Tuning and Receptivity to Novel Information," ***Journal of Experimental Social Psychology***, Vol. 9 (July 1973), pp. 307-19.

10. Michael B. Mazis, Robert B. Settle and Dennis C. Leslie, "Elimination of Phosphate Detergents and Psychological Reactance," ***Journal of Marketing Research***, Vol. 10 (November 1973), pp. 390-5.

11. Michael B. Mazis, Dan M. Smith and Kenneth C. Cosgrove, "The Influence of Personality, Interviewer Race and Respondent Race on Responses to a Racially-Oriented Questionnaire," in Thomas V. Greer (ed.), ***Combined Proceedings***, American Marketing Association, 1973, pp. 309-13.

12. Michael B. Mazis and Dan M. Smith, "A Comparison of General and Product Specific Risk Measures in the Prediction of Gasoline Purchases," in Robert L. King (ed.), ***Advances in Consumer Proceedings***, American Marketing Assoc., 1973, pp. 309-13.

13. Michael B. Mazis and R. Eugene Klippel, "Instrumentality Theories and Consumer Attitudes:  Comparing Alternative Models," in Peter L. Wright (ed.), ***Advances in Consumer Research***, Vol. 1, Association for Consumer Research, 1973, pp. 346-7 (abstract).

14. Michael B. Mazis and John Faricy, "Consumer Response to the Meat Boycott," in Ronald C. Curhan (ed.), ***Combined Proceedings***, American Marketing Association, 1974, pp. 329-33.

15. Michael B. Mazis, "Anti-Pollution Measures and Psychological Reactance: A Field Experiment," ***Journal of Personality and Social Psychology***, Vol. 31 (April 1975), pp. 654-60.  (Abstract published in ***Psychology Today*** and ***Human Behavior***; conducted radio interview on Canadian Broadcasting Corporation's "As It Is" concerning the article.  Reprinted in ***Exploring Social Psychology: The Readings***, Steve L. Ellyson and Amy Halberstadt, editors, McGraw-Hill, 1994.)

16. Michael B. Mazis, Review of David A. Aaker and George S. Day eds., ***Consumerism:  Search for the Consumer Interest, Journal of Marketing***, Vol. 39 (April 1975), p. 113.

17. Michael B. Mazis, Olli T. Ahtola and R. Eugene Klippel, "A Comparison of Four Multi-Attribute Models in the Prediction of Consumer Attitudes," ***Journal of Consumer Research***, Vol. 2 (June 1975), pp. 38-52.

4

18. John Faricy and Michael B. Mazis, "Personality and Consumer Dissatisfaction: A Multivariate Approach," in Edward M. Mazze (ed.), *Combined Proceedings*, American Marketing Association, 1975, pp. 202-5.

19. Dan M. Smith and Michael B. Mazis, "Racial Self-Identification and Self-Concept by Means of Unobtrusive Measures," *The Journal of Social Psychology*, Vol. 98 (1976), pp. 221-8.

20. Michael B. Mazis and Janis Adkinson, "An Experimental Evaluation of a Proposed Corrective Advertising Remedy," *Journal of Marketing Research*, Vol. 13 (May 1976), pp. 178-83 (Reprinted in Richard J. Lutz, editor, *Contemporary Perspectives in Consumer Research*, Kent Publishing Company, 1981).

21. Michael B. Mazis and John H. Faricy, "Teaching the Consumer Behavior Course: A Proper Blend of Theory, Applications and Presentation," for Special Education Issue of *Marketing News* (July 30, 1976).

22. Joel B. Cohen, Olli T. Ahtola, Michael B. Mazis and Lawrence J. Severy, "Extended Expectancy-Value Approach to Contraceptive Alternatives" in *Proceedings of the 84th Annual American Psychological Association Convention*, American Psychological Association, 1976 (abstract).

23. Peter H. Rheinstein and Michael B. Mazis, "Regulation of OTC Advertising:  The FDA 'Prescription'," *Journal of the American Pharmaceutical Association*, Vol. 16 (September 1976), pp. 505-6, 524-5.

24. Louis A. Morris, Michael B. Mazis and Evelyn Gordon, "A Survey of the Effects of Oral Contraceptive Patient Information," *Journal of the American Medical Association*, Vol. 238 (December 5, 1977), pp. 2504-8.

25.  Michael B. Mazis, Louis A. Morris and Evelyn Gordon, "Patient Recall and Attitudes about Two Forms of Oral Contraceptive Patient Information," *Medical Care*, Vol. 16 (December 1978), pp. 1045-54.

26. Albert Wildt and Michael B. Mazis, "Determinants of Scale Response: Label vs. Position," *Journal of Marketing Research*, Vol. 15 (May 1978), pp. 261-7.

27. Michael B. Mazis and Dennis McNeill, "The Use of Marketing Research in FTC Decision making," Subhash C. Jain (ed.), *Research Frontiers in Marketing: Dialogues and Directions*, American Marketing Association, 1978, pp. 308-11.

28. Michael B. Mazis, "Overview of `Can and Should the FTC Restrict Advertising to Children's Workshop'," in William L. Wilkie (ed.), *Advances in Consumer Research*, Vol. 6, Association for Consumer Research, 1978, pp. 3-6.

CONFIDENTIAL

29. Kenneth L. Bernhardt and Michael B. Mazis, "Evaluating Consumer Protection Programs," in Thomas C. Kinnear, et. al. (eds.), *Public Policy Issues in Marketing*, Division of Research, Graduate School of Business Administration, University of Michigan, 1979, pp. 48-62.

30. Michael B. Mazis, "Effects of Information on Product-Related Perceptions," in Jerry C. Olson, ed., *Advances in Consumer Research*, Vol. 8, Ann Arbor, Michigan: Association for Consumer Research, 1980, pp. 538-40.

31. Michael B. Mazis and Louis A. Morris, "Evaluation of the Food and Drug Administration's Patient Package Insert Program," *Proceedings*, 1980 American Psychological Association, Division 23.

32. Michael B. Mazis, "The Future of Consumer Protection Regulation" in Kent B. Monroe, ed., *Advances in Consumer Research*, Vol. 9, Ann Arbor, Michigan: Association for Consumer Research, 1981, pp. 455-7.

33. Kenneth Bernhardt, Thomas Kinnear, Michael Mazis and Bonnie B. Reece, "Impact of Publicity on Corrective Advertising Effects," in Kent B. Monroe, ed., *Advances in Consumer Research*, Vol. 9, Ann Arbor, Michigan: Association of Consumer Research, 1981, pp. 414-15.

34. Michael B. Mazis, "An Overview of Product Labeling and Health Risks," in Louis Morris, Michael Mazis and Ivan Barofsky, eds., *Labeling and Health Risks*, Banbury Center, Cold Spring Harbor Laboratory, Cold Spring Harbor, New York, 1980, pp. 1-9.

35. Michael B. Mazis, Richard Staelin, Howard Beales and Steven Salop, "A Framework for Evaluating Consumer Information Regulation," *Journal of Marketing*, Vol. 45 (Winter 1981), pp. 11-21.

36. Howard Beales, Michael B Mazis, Steven C. Salop and Richard Staelin, "Consumer Search and Public Policy," *Journal of Consumer Research*, Vol. 8, (June 1981), pp. 11-22.

37. Michael B. Mazis and Richard Staelin, "Information Processing Principles for Public Policy Making," *Journal of Public Policy & Marketing*, Vol. 1 (1982), pp. 3-14.

38. Michael B. Mazis, "Effectiveness of Required Information Disclosures to Consumers," in Paul N. Bloom, ed., *Consumerism and Beyond: Research Perspectives on the Future Social Environment*, Cambridge, Mass.: Marketing Science Institute, 1982, pp. 75-8.

39. Michael B. Mazis, Dennis McNeill and Kenneth Bernhardt, "Day-After Recall of Listerine Corrective Commercials," *Journal of Public Policy & Marketing*, Volume 2 (1983), pp. 29-37.

CONFIDENTIAL

40. William L. Wilkie, Dennis McNeill and Michael Mazis, "Marketing's 'Scarlet Letter': The Theory and Practice of Corrective Advertising," *Journal of Marketing*, Vol. 48 (Spring 1984), pp. 11-31.

41. Michael B. Mazis, "Analysis of Medical Consumer Behavior," in Thomas Kinnear, ed., *Advances in Consumer Research*, Vol. 11, Ann Arbor, Michigan: Association for Consumer Research, 1984, pp. 235-7.

42. Ronald Hill and Michael B. Mazis, "Measuring Emotional Responses to Advertising," in Richard Lutz, ed., *Advances in Consumer Research*, Vol. 13, Association for Consumer Research, 1986, pp. 164-69.

43. Kenneth Bernhardt, Thomas Kinnear, and Michael Mazis, "A Field Study of Corrective Advertising Effectiveness," *Journal of Public Policy & Marketing*, Vol. 5, (1986), pp. 146-62.

44. Michael Mazis, "Overlooked Mechanisms for Conveying Information to Consumers" in E. Scott Maynes, ed. *The Frontier of Research in the Consumer Interest*, Columbia, Missouri: American Council on Consumer Interests, 1988, pp. 225-230.

45. Louis A. Morris, Michael B. Mazis and David Brinberg, "Risk Disclosures in Televised Prescription Drug Advertising to Consumers," *Journal of Public Policy & Marketing*, Vol. 8 (1989), 64-80.

46. Michael B. Mazis, "The Marketing of Alcohol: A Spirited Debate," in William L. Wilkie and Patrick E. Murphy, eds., *The Federal Trade Commission in the 1990's*, University of Notre Dame Press, 1990, 221-233.

47. Michael B. Mazis, "Priority Public Policy Research Needs for the 1990's," in William L. Wilkie and Patrick E. Murphy, eds., *The Federal Trade Commission in the 1990's*, University of Notre Dame Press, 1990, 369-373.

48. Michael B. Mazis, Louis A. Morris and John L. Swasy, "An Evaluation of the Alcohol Warning Label: Initial Survey Results," *Journal of Public Policy & Marketing*, Vol. 10 (Spring 1991), 229-41.

49.  Michael B. Mazis, Review of Jef I. Richards, *Deceptive Advertising: Behavioral Study of a Legal Concept, Journal of  the Academy of Marketing Science*, Vol. 20 (Winter 1992), 99-100.

50. Michael B. Mazis, Debra Jones Ringold, Elgin S. Perry, and Daniel W. Denman, "Perceived Age and Attractiveness of Models in Cigarette Advertisements," *Journal of Marketing*, Vol. 56 (January 1992), 22-37.

CONFIDENTIAL

51. Louis A. Morris, John L. Swasy, and Michael B. Mazis, "Accepted Risk and Alcohol Use During Pregnancy," *Journal of Consumer Research*, Vol. 21 (June 1994), 135-144.

52. Manoj Hastak, Romana L. Horst, and Michael B. Mazis, "Consumer Perceptions About and Comprehension of Environmental Terms: Evidence From Survey Research Studies" in Debra Jones Ringold, ed., *Proceedings of the Marketing and Public Policy Conference*, Vol. 4, Baltimore, MD, May, 1994, 94-108.

53. Michael B. Mazis, "The Cellular Telephone Cancer Scare," in *When Lightning Strikes: A How-To Crisis Manual with Classic Case Studies*, Wayne L. Pines, ed., Washington, DC: Washington Business Information, Inc., 1994, 279-290.

54. Michael B. Mazis, "Conducting Research on Nontraditional Media in the Marketing of Alcoholic Beverages," Susan Martin, ed., *The Effects of the Mass Media on the Use and Abuse of Alcohol*, Research Monograph No. 28, NIH Publication 95-3743, Washington, DC: U. S. Department of Health and Human Services, 1995, 239-244.

55. Louis A. Morris, Manoj Hastak, and Michael B. Mazis, "Consumer Comprehension of Environmental Advertising and Labeling Claims," *Journal of Consumer Affairs*, Vol. 29 (Winter 1995), 328-350.

56. Gary T. Ford and Michael B. Mazis, "Informing Buyers of Risks: An Analysis of the Marketing and Regulation of All-Terrain Vehicles," *Journal of Consumer Affairs*, Vol. 30 (Summer 1996), 90-123.

57. Michael B. Mazis, "Copy-Testing Issues in FTC Advertising Cases," in Ronald Paul Hill and Charles R. Taylor, eds., *Proceedings of the Marketing and Public Policy Conference*, Vol. 6, Chicago, IL: American Marketing Association, 1996, 122-130.

58. Michael B. Mazis, Louis A. Morris and John L. Swasy, "Longitudinal Study of Awareness, Recall, and Acceptance of Alcohol Warning Labels," *Applied Behavioral Science Review*, 4 (1996, Number 2), 111-120.

59. Michael B. Mazis and Mary Anne Raymond, "Consumer Perceptions of Health Claims in Advertisements and on Food Labels," *Journal of Consumer Affairs*, Vol. 31 (Summer 1997), 10-26.

60. Michael B. Mazis, "Marketing and Public Policy: Prospects for the Future," *Journal of Public Policy & Marketing*, Vol. 16 (Spring 1997), 139-143.

61. Michael B. Mazis and Louis A. Morris, "The Channel," in Michael S. Wolgalter, John W. Brelsford, David M. DeJoy, and Kenneth R. Laughery, eds., *Warnings and Risk Communication*, London, England: Taylor & Francis, 1999, pp. 99-122.

CONFIDENTIAL

62. Michael B. Mazis, "*FTC v. Novartis*: The Return of Corrective Advertising?," ***Journal of Public Policy & Marketing***, Vol. 20 (Spring, 2001), 114-122.

63. Manoj Hastak, Michael B. Mazis, and Louis A. Morris, "The Role of Consumer Surveys in Public Policy Decision Making," ***Journal of Public Policy & Marketing***, Vol. 20 (Fall 2001), 170-185. (Recipient of Thomas C. Kinnear/*Journal of Public Policy & Marketing* Outstanding Article Award presented by American Marketing Association for articles published 1999-2001.)

64. Michael B. Mazis, "Expanding *JPP&M's* Horizons," ***Journal of Public Policy & Marketing***, in press.

CONFIDENTIAL

PROFESSIONAL ACTIVITIES

Editorial Review Board, *Journal of Public Policy & Marketing*, 1982-2008
Editorial Review Board, *The Journal of Consumer Affairs*, 1998-2008
Editorial Review Board, *Journal of Current Issues & Research in Advertising*, 2002-2008
Editorial Review Board, *Journal of Marketing*, 1991-1996.

Board of Directors, Association for Consumer Research (ACR), 1979-81.

Leadership Board, "Marketing and Society," American Marketing Association (AMA) Special Interest Group, 2003-2008.

Manuscript reviewer for AMA Educator's Conferences, 1976-2007; ACR Conference, 1978-1996; Marketing and Public Policy Conference, 1992-2007; Academy of Marketing Science Conference, 1994; American Academy of Advertising Conference, 1994; ACCI Conference, 2004-2005; *Journal of Consumer Research*, 1980, 1985-1990, 2000; *Decision Sciences*, 1977 and 1980; *Journal of Marketing*, 1981, 1987, 1990-1991, 1999, 2001-2004; *Journal of* **Advertising**, 2002 and 2004; **Journal** *of Marketing Research*, 1985-1987, 1992; *Journal of Consumer Affairs*, 1989, 1991-1992, 1995, 1997; *Journal of Macromarketing*, 2005; **Psychology** *and Marketing*, 1990 and 1997; *Journal of Business Research*, 1991; *Journal of the Academy of Marketing Science*, 1991; *International Journal of Research in Marketing*, 1992; *Safety Science*, 1992; *Alcoholism: Clinical and Experimental Research*, 1994; *Journal of Business Ethics*, 1997; *American Business Law Journal*, 1998, .

Conference Co-chair, Marketing and Public Policy Conference, Washington, DC, 2003.

Conference Director, AMA Workshop, "Marketing and Public Policy: Issues for the 1990's," Washington, D.C., August 1990.

Proposal reviewer for the National Science Foundation, 1978.  Discussant at AMA Educators' Conference, 1976 and ACR Conference, 1979, 1981, and 1983.  Session Chair, AMA Educators' Conference, 1981 and 1988.  Discussant at International Conference on Research in the Consumer Interest, 1987 and at American Psychological Association Conference, 1986.

Invited lecturer at University of Kentucky, University of South Carolina, Duke University, University of Maryland, George Washington University, Penn State University, Georgetown University, and Queen's University.

Presented papers at AMA Educators' Conference, 1970, 1975, 1978, 1988, 1992, and 1994; ACR Conference, 1972-1973, 1977, 1979-1980, 1983, 1985, 1992, and 1994; Marketing and Public Policy Conference, 1990, 1992-2003, 2008-2009; American Public Health Association Conference, 1991; Southern Marketing Association Conference, 1972 and 1973; American Psychological Association Conference, 1976 and 1980; Academy of

CONFIDENTIAL

Marketing Science Conference, 1992; AMA Doctoral Consortium, 1992 and 1993; AMA Faculty Consortium on Ethics and Social Responsibility, 1995; AMA mini-conference on Environmental Issues, 1996; AMA mini-conference on Teaching of Public Policy, 1997.

Presented papers at American Assembly of Collegiate Schools of Business, 1979; Association of National Advertisers' Annual Meeting, 1979; J.C. Penney Consumer Affairs Forum, 1979; American Marketing Association (Washington Chapter), 1979; U.S. Regulatory Council's Innovative Techniques Workshop, 1980; MSI Conference: "Consumerism and Beyond: Research Perspectives on the Future Social Environment," 1982; American Advertising Federation Spring Government Affairs Conference, 1989; "The Federal Trade Commission in the 1990's," University of Notre Dame, 1989; Federal Trade Commission Marketing Symposium, 1991 and 1992; Drug Information Association, 1992; American Bar Association Conference: "How to Launch or Defend Against Competitive Challenges to Advertising Claims," 1995; National Advertising Division Workshop on Consumer Perception Communications Surveys, Council of Better Business Bureaus, 1996; American Bar Association Consumer Protection Conference, "Methodological Issues in Consumer Protection Surveys," 2007; D.C. Bar Association: "Survey to Win: How to Successfully Use Surveys in Trademark Litigation," 2008; Cornell University Law School, 2008; American Bar Association Consumer Protection Conference, "Can Advertising Disclosures Be Effective," 2009.

Organized special sessions at ACR Conference on children's advertising regulation, 1978, and on corrective advertising, 1980. Organized pre-conference workshop "Current Developments at the FTC and FDA" for 2000 Marketing and Public Policy Conference. Organized panel on disclosure research at FTC/NAD Conference "Disclosure Exposure," 2001.

Participated in writing, "Review of the Research Literature on the Effects of Health Warning Labels: A Report to the United States Congress," June 1987.

Wrote "The Effects of the FTC's Listerine Corrective Advertising Order" for Federal Trade Commission, 1981; "An Analysis of Homeowner Experiences with Ward-Corporation-Built Homes" for Federal Trade Commission, 1983; "An Analysis of All-Terrain Vehicle Advertising 1980-87" for Consumer Product Safety Commission, 1988; and "Summary and Analysis of Consumer Surveys on Environmental Claims in Advertising and Labeling" for Federal Trade Commission, 1992 (with Manoj Hastak and Romana Horst); "Consumers' Interpretation of Alternative Environmental Claims" for Federal Trade Commission, 1996 (with Manoj Hastak and Thomas J. Maronick); "The Effect of Consumer Testimonials and Disclosures on Ad Communication for a Dietary Supplement," 2003 (with Manoj Hastak); "Effects of Consumer Testimonials in Weight Loss, Dietary Supplement and Business Opportunity Advertisements," 2004 (with Manoj Hastak).

Member of Advertising and Marketing Panel of the Surgeon General's workshop on Drunk Driving, 1989; Member of Working Group on the Effects of the Mass Media on the Use and Abuse of Alcohol, 1992.

CONFIDENTIAL

<u>CONSULTANCIES</u>

Served as the FTC's principal marketing witness in *FTC vs. Novartis* in 1997, *FTC vs. Trans Union* in 1998, *FTC v. Mercury Mark*eting, 2003, and *FTC v. Telebrands*, 2004. Served also as a marketing consultant for FTC, Food and Drug Administration, Department of Justice, Consumer Product Safety Commission, U.S. Mint, Department of Alcohol, Tobacco and Firearms, and the States of California and Vermont.

<u>HONORS</u>

The American University Award as Outstanding Faculty Administrator (1985) and for
        Academic Program Development (1984)
Nominated for Teacher-Scholar Award (1983, 1985, 1989, and 1993)
Kogod College Award for Scholarship (1991)
Beta Gamma Sigma and Phi Kappa Phi
AACSB Federal Faculty Fellow, 1976-77

<u>COURSES TAUGHT</u>

Undergraduate:  Consumer Behavior, Advanced Consumer Behavior, Marketing Research, and Principles of Marketing.

Graduate:  Consumer Behavior, Marketing Research, Marketing Management, Doctoral Seminar in Consumer Research, Marketing and Public Policy, and Internet Marketing.

<u>UNIVERSITY SERVICE</u>

Elected to University Senate, 1980-1986, 1994-95.
University Senate Vice Chair, 1982-83, Parliamentarian, 1981-82, Nominating Committee, 1982-83, Executive Committee, 1981-83, Chair, Summer Sessions Committee, 1984-85, Secretary, The American University Club, 1988-89, Finance Committee, 1991-93.

AU 85 Committee on Faculty Utilization and Development, 1981-82
AU 100 Ad Hoc Committee, 1987; AU Smoking Task Force, 1988-92

Kogod College of Business Administration Faculty Evaluation Committee, 1979-80, Strategic Planning Committee, 1984-85, Chair, M.B.A. Committee, 1984-85, Rank and Tenure Committee, 1989-91 (chair), 2001-2004, Chair, Educational Policy Committee, 1991, MBA Task Force, 1991-1992 (chair) and 1994-96, Research Committee, 1993, 1996-98 (chair), MBA Oversight Committee, 1994-95, Member, Graduate Educational Policy Committee, 1996-1997, Member, Dean Search Committee, 1995-1996, Member, MBA Admissions Committee, 1995-98, Member, Search Committee for IT Center Director, 2001, Dean's Committee on Communication, 2001-2002, Member, Search Committee for Department of Management faculty member, 2006.

CONFIDENTIAL

**EXHIBIT B**

**DEPOSITION AND TRIAL TESTIMONY
FOR MICHAEL B. MAZIS
IN LAST FOUR YEARS**

- Commonwealth of Pennsylvania v. Peoples Benefit Services, Inc., 2006 – U.S. Commonwealth Court of Pennsylvania (Case No. 557 M.D. 2005) (trial) – consumer protection case

- Prempro Products Liability Litigation (Wyeth), 2006 – E.D. Arkansas (Case No. 4:03-CV-1507-WRW) (deposition) – products liability case

- Bass Pro Trademarks, LLC v. Sportsman's Warehouse, Inc., 2006 – Cancellation Proceeding No. 92045000 (deposition and trial deposition)

- State of Vermont v. R.J. Reynolds Tobacco Company, 2006 and 2008 – Superior Court State of Vermont, Chittenden, SS (Docket No. S1087-05 CnC) (deposition and trial)

- Merisant Company v. McNeil Nutritionals, LLC and McNeil PPC-INC., 2006-2007 – United States District Court for the District of Pennsylvania (Case No. CIV 04CV5504) (deposition  and trial)

- Vital Pharmaceuticals, Inc. v. American Body Building Products, LLC, 2006-2007 – United States District Court for the Southern District of Florida, Miami Division (Case No. 06-60633- CIV-Middlebrooks/Johnson) (deposition and trial)

- CNG Financial Corporation v. Google, Inc., 2007 – United States District Court for the Southern District of Ohio, Western Division (Case No. 1:06CV040 - Beckwith) (deposition)

- Lucas Oil Products, Inc. v. OAO Lukoil, et al., 2007 – United States District Court for the Southern District of New York (Case No. 06-CV-4650 - Berman) (deposition)

- DIRECTV Inc. v. Comcast of Illinois, III, Inc. et al., 2007 – United States District Court for the Northern District of Illinois, Eastern Division (Case No. 07C-2568 - Grady) (trial)

- The Sugar Association v. McNeil PPC-INC and McNeil Nutritionals, LLC, 2007 – United States District Court for the Central District of California, Western Division (Case No. CV 04-10077 DSF (RZX)) (deposition)

CONFIDENTIAL

- Luster Products, Inc. v. Intimate Beauty Corporation and V Secret Catalogue, Inc., 2007 – United States District Court for the Northern District of Illinois, Eastern Division (Case No. 05C-4527 - Grady) (deposition)

- Putney, Inc. v. Pfizer Inc. and MWI Veterinary Supply, Inc., 2008 – United States District Court for the District of Maine (Civil Docket No. 2:07-cv-00108-DBH) (deposition)

- Sanderson Farms, Inc. et al. v. Tyson Foods, Inc., 2008 – United States District Court for the District of Maryland (Case No. RDB 08CV210 - Bennett) (trial)

- Capital Federal Savings Bank v. Eastern Bank Corporation, 2008 – United States District Court for the District of Massachusetts (Civil Action No. 07-CV-11342) (deposition)

- Aerus, LLC v. ProTeam, Inc., 2008 – United States District Court for the Southern District of California (Case No. 05-CV-1065 B) (WMc) (deposition)

- Teflon Products Liability Litigation, 2008 – United States District Court for the District of Iowa, Central Division (4:06-md-01733-REL-CFB) (deposition)

- The Evercare Company v. 3M Company, 2008 – United States District Court for the Northern District of Georgia, Atlanta Division (Civil Action File No. 1:07-CV-2215-BBM) (deposition)

- Thomas Molnar v. 1-800-Flowers.com, Inc., 2008 – United States District Court for the Central District of California (Case No. CV-08-05-0542 CAS(JCx)) (deposition)

- The Laryngeal Mask Company LTD. and LMA North America v. Ambu A/S, Ambu Inc. and Ambu Ltd., 2009 – United States District Court for the Southern District of California (Case No. 3:07-CV-01988-DMS (NLS)) (deposition)

- Experian Information Solutions, Inc v. Lifelock Inc., 2009 – United States District Court for the Central District of California, Southern Division (Case No. SACV08-00165 AG (MLGx)) (deposition)

- Hershey Company and Hershey Chocolate & Confectionery Corporation v. Promotion in Motion, 2009 – United States District Court for the District of New Jersey (Case No. 07-CV-1601 (SDW) (MCA)) (deposition)

- St. Clair Intellectual Property Consultants v. Research in Motion LTD., et al. and St. Clair Intellectual Property Consultants v. Samsung Electronics, Co., Ltd., et al., 2010 – United States District Court for the District of Delaware (C.A. No. 08-371-JJF-LPS and C.A. No. 04-1436-JJF-LPS) (deposition)

CONFIDENTIAL

**EXHIBIT C**

**DOCUMENTS CONSIDERED**

**Discovery Materials**

- Copies of Snapple Product Labels.

- Article: What is Natural?  (Snapple PLTF0001-Snapple PLTF0007).

- Article: FDA petitioned to define 'natural' label claims (Snapple PLTF0008-Snapple PLTF0009).

- Article: Health and Wellness Trend Driving Growth in the U.S. Essential Oils and Oleoresins Markets (Snapple PLTF0010-Snapple PLTF0012).

- Article: Natural Convenience (Snapple PLTF0013-Snapple PLTF0024).

- Article: Fructose - Maybe Not So Natural . . . and Not So Safe (Snapple PLTF0025-Snapple PLTF0028).

- Article: 7UP Drops "All Natural" Claim (Snapple PLTF0029).

- Article: HFCS is not 'natural', says FDA (Snapple PLTF0030-31).

- Article: High Fructose Corn Syrup Not so Sweet for Your Health (Snapple PLTF0032-0033).

- Article: Impacts of Consumer Characteristics and Perceptions on Willingness to Pay for Natural Beef in the Southern Plains (Snapple PLTF0034-Snapple PLTF0048).

- DVDs containing the Snapple television and radio spots (SN0000001 and SN0000002).

- Ready-to-Drink Awareness & Usage Study (SN0000003-SN0000122).

- Snapple and Dr Pepper Revised Linkage Analysis (SN0000123-SN0000188).

- Q1 Information - How Are We Doing (SN0000189-SN0000196).

- Snapple Red Tea (SN0000197-SN0000230).

- January 2006, Snapple Fact Base SPA Introduction (SN0000231-SN0000301).

- February 2006, Snapple SPA Category Fact Base (SN0000302-SN0000430).

- ADM HFCS Certification (SN0000662).

Confidential

- CRA HFCS Certification (SN0000663-SN0000665).

- CRA HFCS Certification (SN0000666-SN0000667).

- CPI HFCS Certification (SN0000668-SN0000670).

- 01/19/2006 Snapple Winning Choices (SN0000671-SN0000715).

- January 2006, Snapple Fact Base SPA Introduction (SN0000716-SN0000736).

- Snapple Meeting Deck (SN0000866-SN0000913).

- Snapple Juice & Juice Drink (power point) (SN0000914-SN0000972).

- Snapple Juice & Juice Drink (power point with notes) (SN0000973-SN0001031).

- Snapple 2005 Marketing Plans (with comments) (SN0001032-SN0001119).

- Snapple — 36 Years of the Best Stuff on Earth (SN0001120-SN0001128).

- February 2006, Snapple SPA Category Fact Base (SN0001129-SN0001257).

- Copy of Certified 07/03/08 Letter to Corn Refiners Association (SN0001586-SN0001588).

- Snapple Website (SN0001589).

- Snapple Website (SN0001590).

- Pathfinder Survey Results Summary (SN0001591-SN0001973).

- Snapple Channel Volume Data (SN0001974-SN0001979).

- Segment Specific Desired Experience (SN0001980-SN0002039).

- Segment Needs Data (SN0002040-SN0002085).

- Segment Volume By Channel (SN0002086-SN0002088).

- Pathfinder Segmentation Map (SN0002089-SN0002101).

- 09/27/2005 Snapple Pathfinder Segmentation Consumer Portraits (SN0002102-SN0002188).

- 07/25/2006 Pathfinder Need State Summary (SN0002189-SN0002192).

- Pathfinder Segmentation Map (SN0002193-SN0002207).

Confidential

- 05/16/2005 Evaluating the Launch of "Return the Favor" Campaign, January - March 2005 (SN0002208-SN0002295).

- Pathfinder Segmentation Map (SN0002296-SN0002310).

- 2007 Q4 Snapple Brand Health, Equity & Marketing Communications Tracker (SN0002311-SN0002382).

- 07/27/2004 Snapple Beverage Group Tracking Study (SN0002383-SN0002476).

- Snapple Outdoor Advertising (SN0002477).

- Snapple Outdoor Advertising (SN0002550).

- Snapple Outdoor Advertising (SN0002551).

- Snapple Outdoor Advertising (SN0002552).

- Snapple Outdoor Advertising (SN0002553).

- Snapple Outdoor Advertising (SN0002554).

- Snapple Outdoor Advertising (SN0002555).

- Snapple 2004 Plan (SN0002556-SN0002637).

- Snapple Company History (SN0002638).

- 04/17/08 Transmittal to FDA — Detailed Description of the Manufacture of High Fructose Corn Syrup (SN0002765).

- 06/24/08 Letter from FDA to Enzyme Technical Association (SN0002766-SN0002768).

- April 2002, Snapple Strategic Position Assessment (SN0002981-SN0003074).

- January 2006, Snapple Fact Based SPA Introduction (SN0003075-SN0003096).

- Snapple Dialogue No. 1 (SN0003097-SN0003167).

- 2007 Q4 Snapple Brand Health, Equity & Marketing Communications Tracker (SN0003168-SN0003242).

- Snapple / Nantucket Nectars Powerpoint (SN0003243-SN0003302).

- Snapple Marketing Deck (SN0003303-SN0003359).

- 09/13/2006, Snapple Master Brand, Agency POV, Where to Evolve (SN0003362-

3                                    Confidential

SN0003389).

- 04/17/2006, Snapple Vision Deck (SN0003510-SN0003544).

- Final CSAB Pathfinder Questionnaire - Online (10/05) (SN0003545-SN0003581).

## Lawsuit Materials

- Second Amended Complaint in *Holk v. Snapple Beverage Corporation*, Case No. 3:07-cv-3018-MJC-JJH, in the United States District Court for the District of New Jersey.

- Second Amended Complaint in *Weiner v. Snapple Beverage Corporation*, Case No. 1:07-cv-08742 (DLC), in the United States District Court for the Southern District of New York.

- Expert Declarations of Plaintiffs' Expert Alan Goedde, Ph.D.

- Expert Declarations of Plaintiffs' Expert Lauran Schultz.

- Transcript of deposition of Stacy Holk.

- Transcripts of deposition of Evan Weiner.

- Transcript of deposition of Timothy McCausland.

- Transcript of Deposition of Alan Goedde.

- Transcript of Deposition of Kyle Currlin.

- Transcript of Deposition of Bryan Mazur.

- Transcript of Deposition of Kristina Mains.

- Declarations of Mark Empie.

- Declarations of Linda Bowles.

- Plaintiffs Evan Weiner's and Timothy McCausland's Memorandum of Law in Support of Their Motion for Class Certification.

## Legislative/Regulatory Materials

- 54 Federal Register 32610 (August 8, 1989).

- 56 Federal Register 60421 (November 27, 1991).

- 58 Federal Register 2302 (January 6, 1993).

4                                                    Confidential

- Code of Federal Regulations Title 21, Vol. 21 (April 1, 2006).

5                                          Confidential