# Exhibit 1c

## to Bryan Mazur's Declaration

Page 1

1                   UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF NEW JERSEY

2
3    STACY HOLK, on behalf of         §
     Herself and all others           §
4    similarly situated,              §
                                      §
5         Plaintiff                   §
                                      §
6    VS.                              §    CIVIL ACTION
                                      §    NO. 3:07-CV-03018-MJC-JJH
7    SNAPPLE BEVERAGE                  §
     CORPORATION,                      §
8                                      §
          Defendant                   §
9
10                  UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF NEW YORK

11
12   EVAN WEINER and TIMOTHY          §
     MCCAUSLAND on behalf of          §
13   themselves and all others        §
     similarly situated,              §
14                                     §
          Plaintiff,                  §
15                                     §
     VS.                              §    CIVIL ACTION
16                                     §    NO. 07-cv-08742
     SNAPPLE BEVERAGE                  §
17   CORPORATION                       §
                                       §
18        Defendant                   §
19
20   ***********************************************
21                    ORAL DEPOSITION OF
22                   KEITH UGONE, Ph.D.
23                     APRIL 16, 2010
24                      CONFIDENTIAL
25   ***********************************************



Page 134

1    Q.    ███████████████████
2         ███████████████████
3    A.    ██████
4    Q.    ████████
5    A.    ██████
6    Q.    From the all natural.  But in paragraph 71 you're
7    indicating that if plaintiffs' allegations were true, one
8    would expect that Snapple would be charging a higher price
9    for its all natural beverages compared to its diet
10   beverages, that's your conclusion, correct?
11   A.    Just ask the question again.
12   Q.    Okay.
13   A.    Slowly.
14   Q.    In paragraph 71 --
15   A.    Yes.
16   Q.    -- it says if plaintiffs' allegations were true
17   you would expect Snapple to be charging a higher price for
18   its all natural ice tea and juice drinks than for its own
19   diet ice teas and juice drinks.
20   A.    Which are not all natural, yes.
21   Q.    Which are not all natural.
22   A.    Yes.
23   Q.    Okay.  That's a conclusion that you made?
24   A.    Based on my understanding of the plaintiffs'
25   allegations that the all natural labeling allows Snapple to

Page 135

1    charge a higher price, okay, now we've got a fork in the
2    road there.  Because what actually happens at the retail
3    level in terms of what consumers are paying, because the
4    supply and demand conditions that give that final retail
5    price.  What I'm saying is, if you take a step back and
6    just look at what Snapple receives --
7    Q.    Right.
8    A.    -- because that would be the gain to Snapple as
9    opposed to a gain to a distributor or a gain to a retail
10   outlet --
11   Q.    And if I can just clarify.
12         MR. BECKWITH:  Let him finish.
13   Q.    (BY MR. LAPINSKI)  Okay.  Go ahead.  I'm sorry.
14   Finish.
15   A.    So my point is that there can be things happening
16   at the retail level that's a function of supply and demand
17   conditions at the retail level and what the pricing
18   strategies are of the retail outlets.  There's a similar
19   set of situations at the distributor level, but if Snapple
20   was trying to extract a gain from an alleged mislabeling
21   associated with all natural, you would expect to see
22   evidence of a gain being extracted to Snapple.  So you look
23   to the ████████████████████████████
24   ███████████████████████
25   ████████  You don't see any differentiation based on

Page 136

1    the content of what's in the bottles.
2    Q.    If there was -- if there was going to be a gain
3    had -- if there's going to be a gain had by Snapple
4    through -- through the allegations that plaintiffs make
5    that it's deceptive in its advertising in order to get a
6    profit, that gain is going to be recognized at Snapple's
7    wholesale pricing level?
8    A.    Because that's where they get their revenue from,
9    yes.
10   Q.    Okay.  Now, in regard to ████████  my
11   question is:  Did you give any consideration to the fact --
12   and let's assume -- let's assume that there are -- for
13   purposes of this conversation right now, let's assume that
14   there is a price premium.
15   A.    Okay.
16   Q.    Okay?
17   A.    Okay.
18   Q.    Let's assume --
19   A.    I feel obligated to say contrary to the evidence,
20   but go ahead.
21   Q.    That's -- say what you want.
22   A.    Okay.
23   Q.    Let's assume that there's a price premium.
24   A.    Yes.
25   Q.    Okay.  Did you give any consideration to the fact

Page 137

1    that if there is a price premium that allows Snapple to
2    charge two extra cents for its product, did you give any
3    consideration to the fact that from a █████████
4    standpoint it's possible that Snapple increased the cost of
5    its diet beverages two cents as well in order to take
6    advantage of that price premium in its diet products also?
7         MR. BECKWITH:  Objection:  Hypothetical,
8    assumes facts.
9    A.    That analysis would require that Snapple and
10   Dr Pepper behave suboptimally on their pricing of their
11   diet products.  What you're saying is, is that -- I
12   think -- I'm going to now fill in what I think you're
13   saying to me, is you're saying, Hey, Ugone, you don't see a
14   difference because they raise the diet price, and that
15   allows them to maintain this hidden price premium, but that
16   then requires a premium to be in the diet side, which is
17   suboptimal because that would then be above the market
18   price for the diet products.  That's why that wouldn't make
19   any sense.
20   Q.    (BY MR. LAPINSKI)  What do you mean by it would
21   be suboptimal for the diet products?
22   A.    Okay.  It's a competitive market.  Firms are
23   profit maximizers.  Depending on the market conditions,
24   there's times that market forces or pressures are imposed
25   on the competitor.  There's nothing you can do about that.

Page 138

1  The market conditions say the price of a diet drink is
2  going to be 75 cents. And they -- the competitor can't
3  suddenly say, Aha, I'm going to charge 77 cents. Because
4  as soon as you start charging the 77 cents, you've now
5  overpriced your product relative to the market forces, it
6  would be suboptimal and you would lose sales that would
7  make that course of behavior unprofitable. That's what I'm
8  saying. So as soon as you try to say, you don't see a
9  premium because they've raised the price -- as a
10  hypothesis. I'm assuming you're asking --
11      Q.  Right.
12      A.  -- this as a hypothesis.
13      Q.  It's a hypothesis.
14      A.  So a hypothesis is, I don't see a differential.
15  I don't see an extraction on the all natural products
16  because they raise the price of the diet products. And I'm
17  saying, Well, if you're raising the price of the diet
18  products, you're now charging too much for the diet
19  products relative to the attributes of the diet products.
20  That would make those products expensive relative to the
21  competition. They would lose sales and so it would be a
22  suboptimal course of behavior to do that.
23      Q.  It'd lose sales and they'd also lose profits?
24      A.  That's my point.
25      Q.  So instead -- instead what you are saying is that

Page 139

1  Snapple's willing to lose profits on its all natural teas
2  by dropping that price down to the price of diet products?
3      A.  No, I didn't say that at all.
4      Q.  Then -- then explain to me how -- what you're --
5  what you're saying then, if I'm correct, is that -- and
6  actually you've said it here, because they ████████ there
7  can be no premium?
8      A.  There's no evidence of an extraction of the
9  premium. In this section here. Okay, there's other places
10  where I'm saying it.
11      Q.  Right. Okay. We're just dealing with this
12  section here.
13      A.  In this section here.
14          MR. BECKWITH: Now, let's get a Q and A
15  going.
16      Q.  (BY MR. LAPINSKI) Go ahead. There's a question
17  out there.
18      A.  Okay. In this --
19          MR. BECKWITH: Well, wait. All I heard was
20  in this section here, that's not a question.
21          MR. LAPINSKI: No, he -- okay. Hang on.
22  For purposes of clarification, he said "In this section
23  here," and I just agreed, yes, limiting his answer to this
24  section here. So if you could read back the last question
25  that was asked.

Page 140

1          (Requested portion was read.)
2      Q.  (BY MR. LAPINSKI) Would you agree that in ████
3  ████ a marketer may offer a product at a cost -- at cost
4  if the incremental sales revenue of another product
5  outweighed the loss?
6      A.  Just ask the question again.
7      Q.  Would you agree that in ████ a marketer
8  may offer a product at cost if the sales revenue of another
9  product outweighed the loss?
10     A.  I would ask the question, why would they take any
11  loss if the price of -- let's just take an example. And
12  let's say we have one diet peach tea drink and an all
13  natural peach tea drink. If the market price at the
14  wholesale level for diet peach tea is 50 cents and if the
15  market price for all natural is 55 cents, going along with
16  plaintiffs' allegations as I understand them, then I would
17  expect the entity that had the products to charge 50 cents
18  for the diet and 55 cents for the -- for the all natural.
19  As soon as you start deviating from that, if you made the
20  diet 55 cents, then you'd be losing diet sales, why would
21  you do that. If you -- if you made the all natural
22  50 cents, you'd be losing revenues on a per unit basis from
23  the all natural sales, why would you do that.
24     Q.  So you wouldn't want to -- you wouldn't want to
25  drop the 55-cent product down to 50 cents?

Page 141

1      A.  Nor would you increase the 50-cent product up to
2  55.
3      Q.  But from an economic standpoint, if you were to
4  consider the five cent incremental profit that you make at
5  increasing the product and compare it to the reduction in
6  the overall volume that you have, there may be a price
7  point there where it does make sense to do that --
8      A.  No.
9      Q.  -- would you agree?
10     A.  No, no. Absolutely not.
11     Q.  So what you're saying is, as soon as the cost
12  goes up -- as soon as the cost is raised above 50 cents
13  using your example --
14     A.  I'm sorry, let's be a little careful, price.
15     Q.  Okay. As soon as the price goes up above
16  50 cents for the diet Snapple product, there's no economic
17  analysis that shows that there's a cost -- a profit benefit
18  to doing that?
19     A.  Right. And let me explain why. There's the
20  55 cents and the 50, let's say those are the profit
21  maximizing prices. As soon as you deviate from profit
22  maximizing prices, you either lose sales -- unit sales or
23  you lose revenue you could have otherwise had. So if you
24  have 50 and 55, why would you bring the 55 down to 50 when
25  you could have gotten 55. That doesn't make sense. Why

36 (Pages 138 to 141)

Page 142

1   would you bring the 50 up to 55 because then you'd lose
2   unit sales?  Why would you do that when the best outcome is
3   the 50, 55?  You have two different prices.  You wouldn't
4   have the same price.  There's no -- I cannot conceive of a
5   situation where if a price is 55 and 50 that it would be
6   profit maximizing to change those prices and make it equal.
7       Q.   Well, you said that one of the considerations is
8   ████████████ that -- that you thought was considered by
9   Snapple was that cost of shipping and cost of packaging,
10   were something that would --
11      A.   Was an input in that decision making.
12      Q.   Was an input in that decision.  When you take the
13  cost of shipping and the cost of packaging and you add that
14  into the equation so that it becomes less expensive from a
15  shipping standpoint, less expensive from a packaging
16  standpoint in order to have ████████ that goes into
17  your profit maximization analysis as well; does it not?
18          MR. BECKWITH:  Objection, hypothetical.
19      A.   What you would have probably is that in both
20  those situations the cost of shipping of those two
21  products -- since they're essentially identical for the
22  sizes and the packages would be the same.
23          This is -- let me give you an easy example.
24  It's like you owning two houses next door to each other.
25  One has a value of 250,000.  The other has a value of

Page 143

1   230,000.  And you say, I'm going to sell both for 250.
2   Good luck.  Or you say, I'm going to sell both for 230.
3   Okay.  You're giving up $20,000.  That's what I'm trying to
4   say with that example, maybe it's easier to see if you own
5   two houses.
6           If Snapple could get an extra nickel on the
7   all natural products and under plaintiffs' contention that
8   with it's all natural labeling that there's a price premium
9   in there, my -- what I'm positing is I would expect to see
10  some differential prices where Snapple was trying to
11  extract the gain from that.  I'm just saying we don't see
12  that in the pricing data.
13          Now, I need to say one more thing.  We're
14  looking at one factor in isolation.  I don't necessarily
15  draw my conclusions on just one analysis I've done in
16  isolation.  It's the totality of what's in my report.  But,
17  clearly, one input I'm looking at is the ████████ at
18  Snapple.  That's consistent with the conclusion that I
19  don't see any price premiums.  But having said that, I
20  don't see any evidence that Snapple has been extracting any
21  gain from that all natural, or that the market -- another
22  converse way to say it -- conversely, is that the market
23  allowed them to extract a gain from that all natural
24  label.  We don't see that in that pricing.  That's what I'm
25  saying.

Page 144

1       Q.   (BY MR. LAPINSKI)  But you didn't -- you didn't
2   do any analysis in regard to that.  You didn't do -- you
3   make the conclusion that if plaintiffs' allegations were
4   true there would be a difference between the regular and
5   the diet.  There would be a difference in price charged by
6   Snapple between the regular and diet?
7       A.   I'm going along with plaintiffs' allegations that
8   an all natural claim commands a price premium in the
9   marketplace --
10      Q.   And --
11      A.   -- with respect to the Snapple products and that
12  it's based on the all natural claim.
13      Q.   But you didn't inquire at all as to whether or
14  not Snapple raised the price of its diet product in order
15  to also benefit from that premium?
16          MR. BECKWITH:  Objection, asked and
17  answered.
18      A.   I did not ask that specific question, but I gave
19  you the economic analysis of why it would not make any
20  sense.  And I gave you the observation that the data does
21  not support the concept that it was an extraction of extra
22  profits correlated with all natural labeling.
23      Q.   (BY MR. LAPINSKI)  You didn't do specific
24  inquiry, but based upon your economic understanding of --
25  of markets?

Page 145

1       A.   Markets and pricing.
2       Q.   Markets and pricing?
3       A.   And the fact that when you price suboptimally, a
4   price being too high or another price being too low, that
5   you'll end up with suboptimal profits.
6       Q.   So is it fair to make a generalized statement
7   that where organizations ████████ there is no difference
8   between -- there is is -- there is no difference between
9   the -- strike that.
10          Do you know if Snapple ████████ during
11  the entire class period?
12      A.   All the price lists I've seen have ████████
13  And my understanding is that that has been a company
14  policy.  I believe I asked that question.  I don't have
15  price lists for the entire time period, but that's my
16  understanding.
17      Q.   Are you aware of whether or not the market
18  perceived Snapple diet beverages to be all natural?
19      A.   Just ask the question again.
20      Q.   Are you aware of whether or not the consuming
21  market perceived Snapple's diet beverages to be all
22  natural?
23      A.   All right.  Two part answer.  Part number one, I
24  didn't do an inquiry into whether the consuming public
25  considered diet to be all natural.  I have strong

37 (Pages 142 to 145)

Page 146

1  suspicions that the consuming public in general, although I
2  don't have any empirical basis for saying this, believes
3  that diet products are not all natural.  I would be very
4  surprised if somebody did a study and came back with a
5  conclusion that diet products were all -- considered to be
6  all natural.
7      Q.  If the consuming public did consider Snapple's
8  diet products to be all natural, would that -- would that
9  have an impact on your conclusion in regard to ███████
10  here?
11          MR. BECKWITH: Objection, assumes facts.
12          And I assume you're stipulating, they're not
13  labeled as such.  There's no evidence of labeling as such.
14          MR. LAPINSKI: Not -- I haven't said that
15  the label --
16          MR. BECKWITH: Objection, assumes facts not
17  in evidence.
18      A.  And I would say that's exactly my point.  That --
19  let's go with your hypothesis that -- or the assumption
20  you're asking me to make.  You said, Ugone, assume diets
21  viewed as all natural, but it doesn't have the all natural
22  label.  Under your theory there would be a premium on the
23  all natural products because of the label over the diet
24  products.  And we don't see that.
25      Q.  (BY MR. LAPINSKI) But from your analysis if

Page 147

1  there was a perception that diet products were all natural,
2  that would -- that would -- that would raise a consumer's
3  willingness to pay more for that product?
4          MR. BECKWITH: Objection: Asked and
5  answered, calls for speculation.
6      A.  It's not my assumption.  It's your assumption
7  that the market will pay more for all natural.  Then you
8  asked me to assume that the diet products were perceived as
9  all natural.  So under your two assumption you've asked me
10  to make that means that the diet products would have a
11  slightly higher price because they're perceived as all
12  natural, under your set of assumptions.  But your
13  allegations in this case is that the all natural label,
14  because of that labeling, created an extra premium.  And
15  I'm saying that's exactly the point, we don't see a
16  premium.  That all natural label even under your
17  assumptions you've asked me to make did not create a
18  premium.  Because under your theories there will be a
19  premium on the all natural label.
20      Q.  (BY MR. LAPINSKI) If you would turn to page 36
21  of your report, Doctor.
22      A.  I'm there.
23          MR. BECKWITH: 36?
24          MR. LAPINSKI: 36.
25      Q.  (BY MR. LAPINSKI) In section eight of your

Page 148

1  report you say that the average retail price data shows no
2  systematic or persistent price premium relative to the
3  benchmark products; is that correct?
4      A.  Yes.
5      Q.  And in making that determination you go
6  through -- you go through an analysis that I'll refer to as
7  a benchmark analysis.
8      A.  Okay.
9      Q.  Is that correct?
10      A.  I can accept that terminology, sure.
11      Q.  And you use your -- this benchmark approach to
12  show that there's no price premium based upon an analysis
13  of the retail price?
14      A.  Let's be a little careful in the phraseology --
15      Q.  Okay.
16      A.  -- and the description because I'm saying a
17  little bit more than that.
18      Q.  Okay.
19      A.  What I'm saying is, is that over time in
20  different geographic areas and in different package sizes
21  and with promotions and coupons and shopper cards, and when
22  you look at average retail prices and every day prices and
23  promotion prices, you have a wide variation and dispersion
24  of prices at the retail level for the Snapple products, so
25  that's the backdrop for everything.

Page 149

1          I then say, What's the data I do have?  I
2  can see all these variations, but I do have average retail
3  data.  I do have average every day price data and average
4  promotion data.  Now, I know that masks some of the
5  variations that you need individual inquiries to figure
6  out.  But given that limitation, let me just see what
7  conclusions I can draw from the average data that I do
8  have.  And on average, using that data, I don't see any
9  systematic or persistent price premium based on this
10  comparison of averages recognizing that that does mask a
11  lot of the variation we see in the data, that you would
12  need individual inquiry to resolve how much consumers pay.
13  Now, I know that was a whole big long answer and we can go
14  to shorthand if you want, but I just want to make sure we
15  understood what this section's saying.
16      Q.  Understood.  Now, going to -- going to the
17  shorthand.  You do implement a benchmark approach in order
18  to support your conclusion that there's no systematic or
19  persistent premium price relative to the benchmark
20  products, correct?
21      A.  Yes.
22      Q.  Okay.  And what's the basis for your
23  implementation of this approach as far as an economic
24  analysis is concerned?
25      A.  If I understand your question, and you'll be able

38 (Pages 146 to 149)

Page 150

1  to tell by my answer whether I do or not. I'm working off
2  my understanding of the plaintiffs' allegations. My
3  understanding of the plaintiffs' allegations and
4  contentions are that there was this mislabeling. That it
5  was -- the Snapple all natural products were labeled
6  inappropriately all natural, and that that allowed Snapple
7  to charge a higher price relative to a benchmark to
8  something that doesn't have the all natural. So what I was
9  trying to do is say, okay, what are the plaintiffs
10  alleging. And given my understanding of what the
11  plaintiffs are alleging, can I do an empirical
12  investigation to see what happens when I start trying to
13  figure out is there any empirical merit to what the
14  plaintiffs are alleging. That's why I did this.
15        So at that point the next step is, well, if
16  this is allegation of a price premium because of the
17  labeling, okay, one has to figure out, okay, what does
18  price premium mean, what is that in comparison to. And
19  that's going down the path of what we did in this section.
20    Q.   Okay. The benchmark approach that you used
21  that's an empirical investigation that you did?
22    A.   Yes.
23    Q.   And that's -- that's a common economic approach?
24    A.   Here's what I need to say. An economist has a
25  tool kit. And when there's a problem that needs to be

Page 151

1  solved, you look into your tool kit and say, What's the
2  appropriate tool to take out to address that problem? So
3  here's where I want to be careful. For the appropriate
4  question that needs to be addressed, benchmarking or
5  yardstick may be an appropriate tool, it's not going to be
6  an appropriate tool for everything, but if you have to do
7  something that lends itself to a benchmarking analysis,
8  yes, that's an appropriate tool.
9    Q.   Okay. And it's -- the benchmark tool is -- is a
10  reliable tool from an economic standpoint?
11    A.   Properly used.
12    Q.   Okay. And it's something that's been tested?
13    A.   I'm not sure what testing means. I can say this,
14  that in the profession there's times when you'll use a
15  benchmarking approach and that it makes sense as long as
16  you're applying it to the appropriate set of circumstances,
17  yes, that's a generally accepted technique given the facts
18  and circumstances.
19    Q.   And I believe you just -- a question or two ago
20  referred to benchmarking and yardsticking.
21    A.   Yes.
22    Q.   Would you consider those two to be similar?
23    A.   Synonymous.
24    Q.   Okay.
25    A.   I was using the term synonymously.

Page 152

1    Q.   You're not contesting the fact that the yardstick
2  approach that Dr. Goedde spoke about is not a sound
3  economic tool; is that correct?
4    A.   What I'm not contesting -- this actually --
5  interestingly, goes back to what I said about Daubert
6  challenges, whether the courts look at generally accepted
7  methodologies and then look at is a generally accepted
8  methodology being used in the right circumstance. My
9  criticisms of Dr. Goedde, which we'll get to later is that
10  latter. But having said that, a yardstick or a benchmark
11  approach is clearly a tool of the tool kit of an economist.
12  The question is, is it the right to tool to answer a
13  particular question.
14        Now, where I disagree with Dr. Goedde is, in
15  this case the yardstick will not yield common proof answers
16  for an entire class, so it's inappropriate here. But I'm
17  not going to say that benchmarking or a yardstick is
18  inappropriate in general because that's not true. I'm
19  saying there's times that it's inappropriate to apply it
20  depending on the facts and circumstances.
21    Q.   And one of the reasons in this case that you find
22  it to be inappropriately applied by Dr. Goedde is because
23  of variations in the retail price, correct?
24    A.   One of many reasons, but, yes, the wide variation
25  in retail price is one of the reasons.

Page 153

1    Q.   ████████████████████████████████████████
2  ████████████████████████████████████████████████
3  ████████████████████████████████████████████████
4  ████████████████████████████
5        For purposes of this litigation in
6  implementing a benchmark approach in order to determine a
7  price premium, why would you not use the wholesale price
8  charged by Snapple?
9    A.   This is actually what I was trying to say before.
10  My opinions are based on the totality of everything in my
11  report. And so I tried to look at the available evidence
12  from every different direction and every different
13  cross section. ██████████████████████████████████
14  ████████████████████████████████████████████████
15  ████████████████████ There is a section in my
16  report that looks at distributor pricing. There is a
17  section in my report that looks at the retail prices, based
18  on geography, channel of distribution, size, flavor. So I
19  tried to look at every which way I could, so I did do what
20  you asked.
21    Q.   One of the -- one of the conclusions that you
22  reached in your report is that you can't use a yardstick
23  approach in order to determine a price premium in this
24  situation because of fluctuations in retail price. Is that
25  a fair statement of -- of --

39 (Pages 150 to 153)

Page 154

1   A.   I would call it shorthand but because of the
2   difference in prices across geographic areas, across time,
3   across channel distribution, across promotions and stores,
4   across the use of coupons, ████████████████████████████
5   ████████████ I'm just roundly speaking.  And so
6   you can't use a yardstick approach and say each person
7   overpaid by five cents.  That wouldn't make sense given the
8   variations we see in all the data.
9       Q.   And my question is:  When looking to analyze for
10  a premium price, why would you not look at the wholesale
11  price?  Why are you looking at the retail price?
12      A.   And I'm saying two things.  One, I did.  And,
13  two, because my understanding of the evidence you put forth
14  is named plaintiffs who contend that they paid more because
15  of the all natural labeling.  That's what was in their
16  deposition.  And so I looked at that because I felt that
17  was responsive to an inquiry that the plaintiffs were
18  talking about.
19      Q.   You looked -- excuse me.  You looked at
20  wholesale -- in response to my question, the first thing
21  you said was I did.
22      A.   Yes.
23      Q.   ██████████████████████████████████████████
24  ████████████████████████
25      A.   ███████████

Page 155

1       Q.   Okay.  Did you look at wholesale pricing from --
2   and consider wholesale pricing from a benchmark approach?
3       A.   I did not have that data.
4            THE REPORTER:  I'm sorry, did not?
5            THE WITNESS:  Have that data.
6       A.   But I didn't see within Snapple evidence of an
7   extraction of a gain from the all natural.  Maybe -- I
8   realize now I misunderstood what you were saying
9   previously.
10           I did look at the wholesale level based on
11  the data I had for what Snapple charges.  And I didn't see
12  evidence within Snapple that relative to their other
13  products of Snapple products that they extracted a gain.  I
14  did not have wholesale data for benchmark products of what
15  they sell to their distributors.  I just don't have that.
16      Q.   (BY MR. LAPINSKI)  With wholesale data for
17  benchmark products, would you be able to do a benchmark
18  analysis?
19      A.   Yes, with an asterisk.  You can always do a
20  benchmarking but you have to be careful about the
21  conclusions you draw if you see differences, what does it
22  mean, just like you were asking me a series of questions.
23  Those are all the types of questions that I would ask that
24  if I did a benchmarking at the wholesale level, I'd want to
25  make sure I understood what the companies were doing, what

Page 156

1   channels they were selling it, understand the pricing, and
2   then make sure I was drawing the proper inferences or that
3   benchmarking is a proper technique.  Because I'm going from
4   okay, we can mechanically do a benchmarking until something
5   is theoretically sound.  But, yes, I could do a
6   benchmarking, I just would take care in making sure I draw
7   the proper conclusions from that.
8       Q.   Right.  There are various factors -- if I
9   understand what you're saying, you wouldn't take the
10  Snapple product and the benchmark product and say wholesale
11  price A, wholesale price B, oh, there's a premium, there's
12  other factors that may be going into there?
13      A.   That's what I would look at, yes.
14      Q.   And you would look at those other factors in
15  order to make a determination whether or not any of those
16  factors had an impact on the price of each product?
17      A.   Correct.
18      Q.   And whether or not it played a role in the
19  differential between the prices?
20      A.   Correct.
21      Q.   And if you did that using wholesale pricing, then
22  that would remove from the equation the issues that you
23  have raised in your report in regard to the use of retail
24  pricing.  Coupons, the use of a coupon would no longer be
25  relevant to the analysis; is that correct?

Page 157

1       A.   Actually, I have to disagree with you a little
2   bit, because there's different sorts of promotions.  There
3   could be something like a shopper card that the grocery
4   store sponsors.  I'll use that term.  But things like
5   coupons could be sponsored at the manufacturer level, so I
6   can't agree with what you just said.
7       Q.   How would a coupon affect the wholesale price?
8       A.   The net net, the effective price changes.
9       Q.   Can you describe for me what you mean by the
10  effective price changing?
11      A.   Well, ultimately the price of the product --
12  there's two ways to look at it.  The price of the product
13  is a derived demand.  So you look at the final product
14  price, what are people willing to pay, you get a price that
15  the retailer buys at.  That's derived from what the
16  consumer's willing to pay.
17           You get what the distributor's willing to
18  sell for, but that's a derived demand from the final
19  product.  You get the price at the Snapple level, but again
20  it's derived from the final price that people are willing
21  to pay.  So that's the first thing.  With a coupon, those
22  prices are changing at the output level.  But, two, the
23  other point I was making is, to the extent that those
24  rebates are coming from the manufacturer level then the net
25  price to the manufacturer is different after the rebates on

40 (Pages 154 to 157)



Page 158

1  the coupons. So that's what I'm saying, you just want to
2  be very careful in the analysis.
3      Q.  Well, the net price charged by the manufacturer
4  does not change based upon the use of a coupon?
5      A.  Let's agree to this: It depends on the mechanics
6  of how it's working. But I will say this, the list price
7  may not change, but there could be an impact on the net
8  effective revenue.
9      Q.  So in the use of coupons the initial wholesale
10  price minus the coupon value would equal the net wholesale
11  price?
12      A.  I would want to understand the mechanics of how
13  they work, so I can see things working differently. All
14  I'm saying is, if there ends up being some sort of
15  subsidization or some reason why the average revenue would
16  decline at the manufacturer level, all I'm saying is you'd
17  want to take that into account.
18      Q.  Now, you're --
19      A.  That's just one of those factors to look at when
20  you're doing your benchmarking.
21      Q.  Okay. And in doing your benchmarking, you were
22  able to use ███████████████ as your benchmark
23  product?
24      A.  One of them.
25      Q.  One of them?

Page 159

1      A.  Yes.
2      Q.  And it's not your position that ████████████
3  ████████ is the only benchmark product that's out there?
4      A.  Correct.
5      Q.  Did you do any -- did you do any research into
6  the existence of other benchmark products for purposes of
7  your analysis?
8      A.  Well, we looked at ████████ and looked at ████
9  and we looked at ██████.
10      Q.  Okay. In regard to ice teas, other than ████
11  and ██████ did you look to see whether or not there
12  were any other products that would be considered benchmark
13  products?
14      A.  If I understand your question, a combination of
15  data we had available, my understanding of the attributes
16  of the Snapple products, let's say the ice tea products
17  with the all natural label. We tried to do what I call --
18  it's a Latin term that they use in economics all the time
19  ceteris paribus, some people say ceteris paribus. What
20  that means is holding all other factors constant. So what
21  an economist does -- and this is part of an economist's
22  tool kit, is to let me -- if I'm going to do an analysis,
23  just change one thing at a time and see what that impact of
24  that one change is. So whenever an economist says ceteris
25  paribus, that's what they mean. I'm going to do a ceteris

Page 160

1  paribus experiment. I'm only going to change one thing and
2  see the impact. That gives us guidance on one of these
3  analyses, especially a benchmarking. If you want to see
4  the impact on price of a particular attribute. And if
5  you're going to use as a benchmark other products, while it
6  may not be perfect, you want to minimize the differences
7  between the two products except for that one attribute.
8  That's kind of the theory behind what we were doing on the
9  benchmarking.
10      Q.  So with the benchmarking you were able to take
11  into consideration various attributes of the Snapple
12  product?
13      A.  Things like hot filled, glass bottle, market
14  segment; all of those factors, yes.
15      Q.  And in doing that --
16      A.  No preservatives, no artificial flavoring. And
17  so what we were trying to do is rather than look at
18  products where two, three or four of those things may be
19  different, you're trying to minimize those differences so
20  you can at least attempt to draw more meaningful
21  conclusions if a price difference was observed.
22      Q.  And from an ice tea standpoint, you were able to
23  look at the attributes and find ███████████████ as
24  one of the benchmark products?
25      A.  Right. So with ████████████ and with the

Page 161

1  Snapple all natural ice tea, you've got the hot filled and
2  all the implications of that, no preservatives, because
3  that's the second attribute, you got the glass bottle,
4  you've got the same market segment. Then as you go a
5  little bit further, you've got HFCS in both, so that's
6  another -- holding all other factors constant. And then
7  ultimately you have one product labeled all natural and the
8  other not. So that's an example of trying to hold as many
9  things as possible constant with one difference, the
10  difference being the attribute you want to measure the
11  impact of.
12      Q.  And that analysis you didn't do it -- strike
13  that.
14      What I'm trying to understand is that you
15  didn't do research and come to the conclusion that
16  Snapple -- that ██████████ was the only
17  product that Snapple could be benchmarked against, did you?
18      A.  Well, we looked at ██████ as well. So maybe
19  I'm a little confused. I looked at ███████ There were
20  other products that we were aware of, say ████████
21  that might have been cold filled, had preservatives, had
22  artificial flavoring, had artificial colors, artificial
23  sweeteners. And now you have five, six, seven, ten
24  attributes that are different rather than one. So there's
25  always data constraints, I'm not going to argue about

41 (Pages 158 to 161)



Page 166

```
1      Q.    Yes.
2      A.    -- or are you asking something different?
3      Q.    I'm asking you to explain footnote 107 and your
4  reference to ▮▮▮▮▮▮ brand-related price
5  premium?
6      A.    Okay.  It's a little on the complicated side, so
7  if you'll bear with me.  My understanding of the
8  plaintiffs' allegations is that there's a price premium
9  associated with Snapple's labeling of all natural when it
10  contains HFCS.  That's my understanding of your
11  allegations, that consumers were paying a higher amount of
12  price premium because of that.  One of the benchmarks I
13  used was ▮▮▮▮▮  And we did a comparison
14  there.  And this was really in an abundance of caution.
15  Now, we saw that on average Snapple's price was lower than
16  the ▮▮▮▮▮ price, so I didn't see any evidence of
17  a systematic price premium, but I was just trying to think
18  ahead where somebody could say, Well, there's this other
19  premium in the ▮▮▮▮ and it has to do with their brand
20  name.  And so because you're telling me that Snapple is
21  priced less than the ▮▮▮▮ it could be that there's
22  this other component in the ▮▮▮  So I was just
23  trying to look at things from every different direction.
24  And so what I did was -- I said, Well, if we just look at
25  the diet side, we looked at the diet ▮▮▮▮ and we looked
```

Page 167

```
1  at the diet Snapple, and if there's a difference there.
2  And if we recognize that difference and then kind of apply
3  it even on the claimed all natural side, does that alter
4  the conclusion.  And I reached the conclusion that, no, it
5  doesn't alter my conclusions if I do that sort of analysis.
6  That's what that footnote is trying to say.
7      Q.    And you did do that analysis, you looked at
8  -- the ▮▮▮▮ diet and the Snapple diet --
9      A.    Yes.
10      Q.    -- looked at the price difference, if any,
11  between the two of those and then --
12      A.    And said, Okay, if you look in the --
13      Q.    Let me -- let me finish my question.  Now, I got
14  to think where I was in my question.
15          You looked at ▮▮▮▮ diet, you looked at
16  Snapple diet.  You looked at a price difference, if any,
17  between the two of them.  And then in layman's terms backed
18  out the premium that you saw there from the ▮▮▮▮ -- the
19  ▮▮▮▮ price that you were comparing to Snapple; is that
20  correct?
21      A.    Essentially that's what we kind of looked at,
22  yes.
23      Q.    Okay.  And that's an analysis that you did?
24      A.    That's an -- I mean, it was -- yes.  I mean, it
25  wasn't a -- you know, it wasn't a full-blown formal
```

Page 168

```
1  analysis, but looking at some of the prices we saw in the
2  data and we just try to describe it in the footnote.  But
3  looking at the prices we saw in the data, at least kind of
4  mentally doing that exercise, we didn't see any reason that
5  would alter our conclusions that I was drawing with ▮▮▮▮
6  ▮▮▮ as the benchmark.
7      Q.    But it's possible that once you do a formal
8  analysis along the -- the brand-related premium that it may
9  alter the numbers that you calculated?
10      A.    I was --
11          MR. BECKWITH:  Objection, mischaracterize.
12      A.    Yeah, I was very comfortable with what we saw
13  that would not alter; otherwise, I would have taken it
14  further.
15      Q.    (BY MR. LAPINSKI)  And is that analysis set forth
16  anywhere in the footnote?
17      A.    The footnote says what we did.  That's why I said
18  that in the footnote.
19      Q.    Well, the footnote says that you performed a
20  price comparison between the average retail prices of
21  Snapple all natural ice tea and that of ▮▮▮ in
22  grocery stores in New York.  Taking into account the
23  consideration of that the average retail prices of ▮▮▮
24  ▮▮▮ carried a brand-related price premium.  My
25  question is:  Is there anywhere in the footnote or any of
```

Page 169

```
1  the documents that you've provided or relied upon that show
2  the analysis that you did of the ▮▮▮ diet product and
3  the Snapple diet product?
4      A.    No.  So what Mr. Goedde could do is just look at
5  the data and he would be able to just look at the data by
6  inspection and see if there's differences and apply it
7  over.  It wasn't that complicated of an analysis.
8      Q.    And what -- what specific data are you referring
9  to?
10      A.    So you got the ▮▮▮ diet data that's, I
11  believe, in some of the spreadsheets that have been turned
12  over.  You've got the Snapple diet data that's in the
13  spreadsheets that were turned over.  Now, at that point you
14  can choose how you want to look at it, how you want to
15  aggregate, whether you do it on package size or whether you
16  do it in geographic area.  But just compare those prices,
17  see the difference, and then you can easily just see
18  whether that causes a meaningful change in what's reported
19  in my report.  That's what I'm saying.
20      Q.    In regard to your benchmark approach, if
21  wholesale prices are used in benchmark analysis then the
22  actual price paid by the consumer doesn't play a role in
23  the analysis, correct?
24      A.    I just -- I need the question again.
25      Q.    If the wholesale price is used in a benchmark
```

43 (Pages 166 to 169)

Page 170

1  analysis, then the actual price paid by the consumer is
2  isn't a factor, correct?
3      A.   Here's where I'm stuck.  If we were extracting
4  away to some other analysis, some other case then maybe I
5  could answer your question.  I'm just always trying to
6  understand your questions in the context of what I
7  understand the allegations of this case are.
8           And so I look at things every which way I
9  can, but I'm ultimately also coming back to my
10  understanding that you contend -- or the plaintiffs
11  contend that the final consumer paid a price premium at the
12  retail level.  So we can look at the wholesale level and I
13  did look at the data that I had.  And I don't see any
14  evidence of Snapple extracting this price premium or this
15  gain.  But I'm just stuck a little bit in your question
16  about the retail not playing a role if we just look at the
17  wholesale level.  Then I'm kind of lost of where we're
18  going in the case a little bit.  So maybe just ask me to
19  assume that way, but that's the problem I have with the
20  question.
21      Q.   Well, I guess what I'm asking you to do is I'm
22  asking you to make an assumption that you're going to apply
23  the wholesale price to the benchmark analysis.  And
24  assuming that you use a wholesale price instead of a retail
25  price, then the retail price paid by the consumer would not

Page 171

1  be a factor, correct?
2           MR. BECKWITH:  Objection, asked and
3  answered.
4      A.   When you say it wouldn't be a factor, I keep
5  losing you.
6      Q.   (BY MR. LAPINSKI)  It wouldn't be a factor that
7  you would consider in your benchmark analysis?
8           MR. BECKWITH:  Same objection.
9      Q.   (BY MR. LAPINSKI)  If you're using the wholesale
10  price instead of the retail price, then the retail price
11  paid by the consumer would not be a factor?
12      A.   I could do a benchmarking at the wholesale level
13  if all the competitors were willing to provide that data.
14  And I can do that analysis.  But ultimately I think a
15  question too is, the wholesale price is a derived demand
16  from the final market price.  In other words, how much
17  Snapple is able to get at the wholesale level is derived
18  from a demand for the final product, right.  And then you
19  start backing off the various margins people have to get
20  into the distribution chain.  It's always true at the
21  manufacturing level that that's a derived demand from what
22  the final consumer is willing to pay.  So I wouldn't
23  necessarily divorce the entire analysis.  I could still see
24  a role for the retail analysis.
25      Q.   If -- if you're using wholesale price data would

Page 172

1  you be able to remove the channel of distribution as a
2  factor in your analysis?
3      A.   My understanding is --
4           MR. BECKWITH:  I'm going to object real
5  quick.  It calls for a hypothetical.
6      A.   I don't see how you remove it since my
7  understanding is that the manufacturers do charge different
8  prices at the different -- in the different channels of
9  distribution.
10      Q.   (BY MR. LAPINSKI)  And when you say --
11      A.   So you'd -- even in the most simple world, you'd
12  have three different prices.
13      Q.   And what --
14      A.   I'm sorry.  I way underestimated that.  You'd
15  have one price for each channel of distribution.
16      Q.   You'd have one price for each channel of
17  distribution, by channel of distribution you mean a grocery
18  store?
19      A.   Truck store, convenient store, mass
20  merchandisers, kiosks, whatever those channels.  So you
21  only have data on -- and we've only -- we were only able to
22  get data on drugstores, convenience stores and grocery
23  stores.  Those are not the only channels of distribution.
24  There's mass merchandisers and there's other channels of
25  distribution as well.

Page 173

1      Q.   But the -- the data that you did have --
2      A.   I'm talking about at the retail level, but that's
3  why I'm saying that whole chain of data, if you were to
4  look at -- do the full-blown analysis.
5      Q.   Well, the data that you have in regard to prices
6  charged by Snapple to -- through the different channels of
7  distribution, were there price differences?
8      A.   In the different channel -- I think -- I don't
9  remember exactly the data.  My understanding is there's a
10  difference by channel distribution.  I would have to go
11  back and look to see exactly what those are.
12      Q.   If there wasn't a price difference in the
13  different channels of distribution then --
14      A.   Then that wasn't important to Snapple and their
15  pricing.
16      Q.   Okay.  And that wouldn't -- that wouldn't be a
17  factor that you would consider in the benchmark analysis?
18           MR. BECKWITH:  Objection, hypothetical.
19      A.   It depends.
20      Q.   (BY MR. LAPINSKI)  What does it depend on?
21      A.   Well, it is always true that there's a difference
22  between theoretically what you want to do and then when you
23  get the data, what actually happens.  So my -- it
24  depends -- answer depends on once you start getting the
25  data in and you're looking at it, you start realizing some

44 (Pages 170 to 173)

Page 178

1    A.   Okay.
2    Q.   From an economic standpoint, what's the relevance
3  of significant or meaningful?
4    A.   Can we go to that section in my report where you
5  were thinking of.
6    Q.   We can.  Paragraph 30, It is my understanding
7  that Snapple has retained Dr. Michael Mazis to determine
8  whether all natural labeling of Snapple's all natural
9  products played a significant or meaningful role.
10       And I just want -- I just want an
11 understanding as to what you mean by significant or
12 meaningful?
13   A.   In that context it would be whatever Snapple and
14 Dr. Mazis determined to be significant and meaningful.
15 That wasn't my definition there.  That was my understanding
16 of what he was asked to do.
17   Q.   That would -- that's your understanding of what
18 he was asked to do, but your conclusion is that because he
19 concludes that all natural was not part of Snapple's
20 advertisements in a significant or meaningful way that --
21 strike that.
22   A.   You know, another way to say this -- just to be a
23 little helpful.  There's further explanations on A, B and
24 C.  And I think that gives, at least to me, some guidance
25 as to what Mr. Mazis -- Dr. Mazis was thinking along those

Page 179

1  lines in terms of significant or meaningful.  So, for
2  example, on B, the all natural message played almost no
3  role in Snapple's advertising.  So I think that gives some
4  guidance as to what he was probably thinking.
5    Q.   And in regard to the all natural message playing
6  almost no role in Snapple's advertising, that's not
7  something that you yourself researched?
8    A.   That's correct.
9    Q.   Okay.  You rely on Dr. Mazis for his findings as
10 you reflect here in B?
11   A.   I'm reporting his findings -- actually, with
12 respect to that particular issue, with all due respect to
13 Dr. Mazis, I don't need him one way or another for my
14 analysis on that particular point.  But that point is
15 supportive of what I'm trying to say on the individualized
16 inquiry, but if he has never given that opinion, it doesn't
17 affect my analysis.
18   Q.   Your analysis would also be that all natural was
19 not -- did not play a significant role -- significant or
20 meaningful role?
21   A.   No, no.  I'm not giving those opinions.  Those
22 are Dr. Mazis' or Mazis' opinion.  I'm looking at -- all the
23 data that I've seen tells me individualized inquiry is
24 required.  He, in a sense, is giving a consistent opinion
25 with some actual examples, ▓▓▓▓▓▓▓▓▓▓▓

Page 180

1   ▓▓▓▓▓▓▓▓▓▓ That all natural isn't -- doesn't play
2  a prominent -- or it plays almost no role in the
3  advertising.  I'm saying all of that is consistent with the
4  opinion I'm giving that individual inquiry would be
5  required.
6    Q.   I may have misunderstood your previous answer, so
7  let me -- let me test my understanding.
8    A.   Sure.
9    Q.   What you're saying is that you provide
10 information in here in regard to Dr. Mazis' findings?
11   A.   Yes.
12   Q.   However, even if you were to take out Dr. Mazis'
13 findings, your findings would still be the same as what
14 they are?
15   A.   Absolutely, yes.
16   Q.   Okay.  I misunderstood your previous answer.  I
17 apologize.
18       If you will turn to the latter part of your
19 report where you address Dr. Goedde's findings.
20   A.   Okay.  So turning to page 51 where the Roman
21 numeral section 11 starts.
22       MR. BECKWITH:  51, is that what you said?
23       MR. LAPINSKI:  51 is where it starts.
24       MR. BECKWITH:  Thank you.
25   Q.   (BY MR. LAPINSKI)  Now, I believe you testified

Page 181

1  earlier that your issue with Dr. Goedde's findings are not
2  in the use of a benchmark or yardstick approach.  The issue
3  you have is that he did not consider several factors that
4  would need to be considered; is that correct?
5    A.   Actually, I wouldn't describe it that way at all.
6    Q.   Okay.
7    A.   What I testified earlier is, under the
8  appropriate circumstances a yardstick or a benchmarking
9  approach is a generally accepted methodology, under the
10 appropriate circumstances.  I don't see it to be an
11 appropriate answer for the inquiry in these facts and
12 circumstances given the totality of what's in my report.
13 You can't use a yardstick approach, come up with a common
14 proof of alleged injury, say that will apply to all class
15 members using a yardstick approach to do that.  In light of
16 everything that's in my report that forces one to the
17 conclusion that you need individual inquiry.
18   Q.   Which mean all of the denominators . . .
19   A.   All the reasons why there's price differences,
20 all the reasons why people have paid different amounts,
21 given my understanding of the plaintiffs' theories.
22       So here's the easiest way to do it.  If he
23 wants to use that -- he said this in his deposition.  You
24 want to use a yardstick approach and you say that there's a
25 nickel price premium, well, we know people are paying

Page 182

1   between -- this is roundly speaking
2
3
4
5                                some people knew about HFCS, some
6   people used a promotion, some people used a two-for-one
7   coupon. And I'm just saying, you can't take a general
8   yardstick approach and end up with anything close to --
9   even from a class perspective, accepting plaintiffs'
10  theories, any proper compensation to the individual class
11  members under the -- under the theories of the case.
12      Q.  Because of the various factors that you just --
13      A.  Right. Said.
14      Q.  -- mentioned now, and that are included in the
15  your report?
16      A.  Right. That are just summarizing.
17      Q.  Now, you were able to use a benchmark approach to
18  show that there was no premium, but what you're saying is
19  that you can't use a benchmark approach to show that there
20  was a premium?
21      A.  Actually, let's be careful. Because remember
22  what I said at the very beginning -- I said, I'm going to
23  say a big long answer, that's my opinion, and then we're
24  going to go shorthand from there. Okay. I don't know if
25  you remember this. Remember I said, Here's all the reasons

Page 183

1   why you need individual inquiry. I gave a big long answer
2   to that. That is my opinion. Then I recognize, I do have
3   some average retail price data, average every day price
4   data and average promotion price data. Recognizing that
5   the average data masks some of the variations, let me just
6   see what I can draw -- what conclusions I can draw. And
7   the conclusion I drew in addition to the need for
8   individual inquiry, is that when you look on an average
9   basis you don't see the systematic price increase. So then
10  I said from there, We can take all the shorthand you want,
11  but let's never forget what my real opinion is.
12          MR. LAPINSKI: You know what, Van, let me
13  take five minutes.
14          MR. BECKWITH: Okay.
15          (Recess from 2:47 p.m. to 2:57 p.m.)
16      Q.  (BY MR. LAPINSKI) Dr. Ugone, is it your
17  position, as an economist, that you're unable to use survey
18  studies and market research in order to analyze incremental
19  value in a product?
20      A.  What I state in my report is --
21      Q.  Well, this is a general question.
22      A.  Oh, we're extracting away from --
23      Q.  You as an economist.
24          MR. BECKWITH: Could you repeat it or have
25  it read back.

Page 184

1           MR. LAPINSKI: I'll repeat it.
2           MR. BECKWITH: Sorry.
3       Q.  (BY MR. LAPINSKI) Is it your position as an
4   economist that you're unable to use survey studies and
5   market research in order to analyze incremental value?
6       A.  If we're just talking about in the abstract, I
7   think surveys can have a time and a place.
8       Q.  On page 54 of -- I apologize. On page 55 of your
9   report, paragraph 81, states, With respect to the use of
10  studies and market research, it is widely acknowledged that
11  there is a significant difference between what a person
12  responding to a survey claims they would be willing to pay
13  and what a person would actually pay when faced with a
14  variety of options in real-life marketplace setting.
15      A.  Yes.
16      Q.  Okay. And below that you have three different
17  statements or hypothesis that you put there. The first
18  one, A, willingness to pay versus market price. What is
19  the basis of that opinion?
20      A.  I'm going to give a multipart answer here. Every
21  economist will tell you there's a difference between -- let
22  me try it this way. Every economist will say, You know,
23  don't tell me what you think, tell me what you do. Don't
24  tell me what you say, tell me what you do. So actual
25  revealed preference in the marketplace in terms of actual

Page 185

1   purchasing behavior, obviously, is more accurate than just
2   we -- what people say.
3           In other words, when push comes to shove and
4   you have to spend your dollars and have a limited budget
5   constraint, that could be very different from what people
6   say. So that's sort of the first observation.
7           The second observation is -- and here's the
8   easiest way to say it, a willingness to pay versus the
9   market price. You only have to pay a dollar, let's say,
10  for a bottle of water. But if you were down here in Texas
11  on August 10th and it's 105 degrees and humid, you might be
12  willing to pay $2, but all you have to pay is a dollar
13  because that's the market price.
14          And there's even a concept in economics
15  called consumer surplus. And that's the gain you get as a
16  consumer because there's many times for many products your
17  willingness to pay is greater than the market price. Those
18  are all the things you have to be careful with in surveys,
19  so I'm not saying, you can never use surveys. I'm saying
20  they have a time and a place. And you have to make sure
21  you don't misuse them when you're addressing a particular
22  question. And here I've given you three examples of where
23  you want to be careful not to misuse the survey. And all
24  of that is abstracting away from a survey, just like the
25  average data is going to mask the differences -- the

47 (Pages 182 to 185)

Page 186

1  individual differences between the consumers that we know
2  exist in this case. And it may at best give you one number
3  that is not going to be true for any of the consumers. So
4  that ultimately is what's going on. But with respect to
5  this willingness to pay I think I've tried to be complete
6  in my answer for you.
7      Q.   The willingness to pay versus market price that
8  opinion is not based upon any specific information that is
9  put -- put forward here in the documents that you've
10  produced. That's based upon your experience as an
11  economist?
12     A.   You can probably find it in those books. I mean
13  it's such a standard economic theory that I, you know, it's
14  like if the sky's blue, I mean, I . . .
15     Q.   That's what I want -- that's what I wanted to
16  understand. I wanted to understand whether or not you were
17  stating this as a standard economic theory or whether there
18  was conclusions that you had drawn based upon the documents
19  that you've looked at in this case in order to make that
20  statement.
21     A.   Correct.
22     Q.   So it's the former, it's a standard economic
23  theory?
24     A.   Yes.
25     Q.   Okay. As far as B is concerned, the opinion in

Page 187

1  B, overemphasis of surveyed attribute. Same situation --
2  we're on page 55.
3      A.   I think this is generally accepted. I think the
4  point here was, again, if you're going to apply a survey
5  you need to make sure you don't fall into potential
6  pitfalls of taking a survey that might actually be designed
7  for one purpose and apply it to another purpose. So I'm
8  not saying all surveys are deficient, because there's
9  people out there that specialize in that and actually do
10  quite a good job. But the question is, a survey is often
11  designed for one particular purpose and where you have to
12  be careful is when you take something designed for one
13  purpose and apply it to another purpose, that's when I say,
14  Well, wait a minute, let's be careful about these factors
15  I'm bringing up.
16     Q.   And as far as the third one, Failure to consider
17  budget constraints.
18     A.   So the example there is imagine a survey that
19  says, Well, how much more would you have to -- would you be
20  willing to pay for, you know, for a blue car rather than a
21  red car, so you say $100 or $1,000, I like blue that much.
22  Well, but when you have to write that check and you take
23  into account, well, I also have to buy food this month.
24  I've got to pay my rent and my mortgage. When you bring in
25  the budget constraint, you have to be careful that when

Page 188

1  you're taking a survey designed for one purpose and trying
2  to draw inferences for another purpose, did the consumer
3  really take into account their budget constraint when
4  you're looking at a willingness to pay for these different
5  attributes.
6      Q.   And, again, that's based on a common economic
7  principle as compared to research and review of documents
8  that were made available to you in this case?
9      A.   Yes, yes.
10     Q.   Okay. And when we first started talking about
11  these three paragraphs, you reached over and you grabbed
12  two economic books. And am I correct that the two economic
13  books that you reached for, are the two books that are
14  cited in footnote 16 of your report?
15     A.   Yes. And I can tell you where to look. So look
16  up -- if you want to have somebody look it up, look up the
17  concept of consumer surplus. It's the area under the
18  demand curve above the price you have to pay.
19         MR. LAPINSKI: I have no further questions.
20         MR. BECKWITH: We'll reserve all questions
21  till the time of trial.
22         (Deposition was concluded at 3:04 p.m.)
23
24
25

Page 189

1           CHANGES AND SIGNATURE
2  WITNESS NAME: _____ DATE OF DEPOSITION: _____
3  PAGE    LINE   CHANGE          REASON
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____